# IN THE SUPREME COURT OF TEXAS

══════════
No. 13-0199
══════════

KCM Financial LLC, R.J. Sikes, Roger Sikes, Kathy Sikes, Greg Louvier, Pam Louvier, Christy Rome, R. Crist Vial, Dacota Investment Holdings, L.L.P. a/k/a Dacota Investment Holdings, L.P., Range Resources Corporation, and Range Production I, L.P, Petitioners,

v.

Betty Lou Bradshaw, Respondent

══════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Second District of Texas
══════════════════════════════════════════════

**Argued October 15, 2014**

Justice Guzman delivered the opinion of the Court

This oil and gas dispute involves a challenge to the validity of a mineral lease and requires that we once again examine the contours of the duty the executive-right holder (executive) owes to a non-participating royalty interest holder (non-executive). Here, the non-executive claims the executive procured a mineral lease in derogation of a duty of good faith owed to her. Although we recognize an executive has broad discretion in negotiating the terms of a mineral lease, we have long held that, in doing so, the executive owes the non-executive a duty of utmost good faith and fair dealing. Though we have rarely had occasion to explore the scope of this duty, we have explained that, unlike a typical fiduciary relationship, the executive is not required to wholly subordinate its

interests in favor of the non-executive if their interests conflict. As we have articulated the duty, the executive has autonomy in negotiating the terms of a mineral lease but does not have absolute discretion to determine the value of the non-executive interest. In this way, the duty imposed on the executive strikes a balance between the parties' bargained-for rights. Although the parameters of the duty are imprecise, at bottom, the executive is prohibited from engaging in acts of self-dealing that unfairly diminish the value of the non-executive interest.

In the present case, which involves an oil and gas lease on nearly two-thousand acres of land in north Texas, the non-executive contends that the executive breached its duty by executing a mineral lease on terms that included a sub-market royalty rate, which the executive and non-executive would share equally, in exchange for an above-market bonus payable only to the executive. The non-executive further alleges that the lessee acted in concert with the executive in facilitating the breach and that the executive's ill-gotten gains were fraudulently transferred to third parties. The trial court granted a take-nothing summary judgment on all claims, but the court of appeals reversed the judgment in significant part based on the existence of fact issues.

On appeal to this Court, the parties seek a definitive articulation of the executive's duty as it pertains to any obligation to maximize the royalty terms in a mineral lease. Given the relative rights and interests at play, no bright line rule can comprehensively or completely delineate the boundaries of the executive's duty. Rather, in determining whether an executive has fulfilled its duty of utmost good faith and fair dealing in executing a mineral lease, the lease and the circumstances of its execution must be considered as a whole, and the failure to negotiate a market-rate royalty is but one relevant factor. Simply put, the executive's failure to obtain a market-rate royalty does not

conclusively establish a breach of duty, nor is it totally irrelevant. On the record before the Court, we hold that fact questions preclude summary judgment as to the non-executive's breach-of-duty claim against the executive. We therefore affirm that portion of the court of appeals' judgment and remand the breach-of-duty claim to the trial court. We further conclude, however, that summary judgment was proper as to the claims against the remaining defendants and therefore reverse that portion of the court of appeals' judgment and render judgment that the non-executive take nothing on those claims.

## I. Factual and Procedural Background

Betty Lou Bradshaw holds a non-participating royalty interest in approximately 1,773 acres of a nearly 2,000 acre parcel of land in Hood County, Texas known as the Mitchell Ranch. A non-participating royalty interest is

> an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the [b]onus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by the owner of the mineral fee estate.

Lee Jones, Jr., *Non-Participating Royalty*, 26 TEX. L. REV. 569, 569 (1948) (footnote omitted); *see also Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789-90 (Tex. 1995). In oil and gas parlance, the owner of a non-participating royalty interest is referred to as a non-executive interest holder, while the holder of the leasing privilege, typically the mineral fee owner, is the executive interest holder.[1] In this division of rights, the executive has the power to make and amend leases affecting

---

[1] *See In re Bass*, 113 S.W.3d 735, 745 (Tex. 2003) ("By definition, all non-participating royalty interests are non-executive interests."); R. Hemingway, LAW OF OIL AND GAS, § 2.2 (3d ed. 1991) ("The power to lease, sometimes referred to as the executive right, is the right to transfer the development rights of the mineral estate to another. Such power may be exercised as an incident of the ownership of the mineral estate owned by the holder of the power to

3

the enjoyment of the non-executive's interests.

Bradshaw inherited her royalty interest from her parents, J.A. and Lota Fay Driskill, who had reserved the interest in two deeds that were executed in 1960 to convey the surface and all mineral interests, including leasing privileges, to third parties. The deeds described the reserved royalty interest as an undivided one-half of any future royalty and limited the executive right by mandating that any such royalty be "not less than" one-eighth.[2] Thus, under the 1960 deeds, the reserved interest was not capped, and the minimum interest the Driskills reserved was a one-sixteenth share of gross production.

A one-eighth royalty appears to have been commonplace in the general era in which the 1960 deeds were executed. As one commentator wrote in a well-regarded article, "The usual royalty is 1/8, and this fact is so generally known that judicial knowledge may be taken of it." Jones, 26 TEX. L. REV. at 575-76 (citations omitted); *see also Schlittler v. Smith*, 101 S.W.2d 543, 544-45 (Tex. 1937) (suggesting that one-eighth royalty was typical at that time). Indeed, so standard was

---

lease."); *see also Day & Co. v. Texland Petroleum, Inc.*, 786 S.W.2d 667, 669 (Tex. 1990).

[2] The three applicable provisions of the 1960 deeds read as follows:

"The Grantors herein reserve unto themselves, their heirs and assigns, and except from this conveyance an undivided one-half (1/2) Royalty (being equal to not less than an undivided one-sixteenty [sic] (1/16)[)] of all the oil, gas and/or other minerals in, to and under or that may be produced . . . ."

"Said interest hereby reserved is a Non-Participating Royalty. . . . Grantee herein, his heirs and assigns, shall have the right to lease said land for oil, gas and other minerals provided, however, that all such leases shall provide for Royalty of not less than one-eight [sic] (1/8)."

"In the event oil, gas or other minerals are produced from said land, then said Grantors, their heirs and assigns, shall receive not less than one-sixteenth (1/16) portion (being equal to one-half (1/2) of the customary one-eighth (1/8) Royalty) of the entire gross production and/or such net proceeds as hereinabove provided."

a one-eighth royalty that it was assumed to be the default minimum: "If the grant or reservation is silent as to the minimum royalty to be reserved in subsequent leases, utmost fair dealing would seem to require the reservation of a royalty of at least the usual 1/8." Jones, 26 TEX. L. REV. at 575-76. However, it was not unusual to reserve an interest in a royalty of "not less than" the customary one-eighth to allow the non-executive to share in enhanced royalties secured by the executive:

> The common practice . . . is to include an express provision in the grant or reservation of non-participating royalty to the effect that subsequent leases shall provide for a royalty of not less than the usual 1/8. Such a provision would seem to afford the non-participating owner ample protection and entitle him to a share in any royalty, as such, in excess of the usual 1/8.

*Id*. at 576. Thus, the language and structure employed in the 1960 deeds was neither unusual nor particularly idiosyncratic.

As it happens, Bradshaw alleges that, as a result of market trends and larger economic forces, the customary royalty had increased to one-fourth by July 2005. At that time, Wise Asset held the surface and mineral estate interests in the Mitchell Ranch but no development had commenced. Bradshaw claims that at least one company had approached her during that time period and offered to pay a one-fourth royalty to lease and develop the property. As a non-executive, Bradshaw had no authority to develop the property or negotiate the terms of a mineral lease, and the record does not disclose whether this putative offer was ultimately communicated to Wise Asset or what otherwise became of it.

However, a few months later, an individual named Gary Humphreys contracted with Wise Asset to purchase the entire Mitchell Ranch tract, including the mineral estate, for $18,943,000. No royalty appears to have been a part of that contract. The contract permitted Humphreys to extend

the 90-day termination option three times by paying Wise Asset $100,000 for each 30-day extension.

On February 14, 2006, after having exercised all three extension opportunities, Humphreys assigned his interest in the Mitchell Ranch contract to Texas Shepco, LP, a limited partnership managed by R.J. Sikes. In an agreement dated the same day, Humphreys executed a contract with Peter Bennis, president of a bank in Keene, to jointly develop the Mitchell Ranch.[3] Humphreys agreed to pay Bennis 40% of any royalty interests and also assigned 40% of his interest in the Mitchell Ranch contract to Bennis. Bennis thereafter negotiated with Chesapeake Energy to sell the Mitchell Ranch and informed Humphreys that Chesapeake "will pay $250,000 over the contract price and give us 1/16 or 6.25% of the large tract and 12.5% of the smaller tracts." In order to consummate a deal, however, Bennis warned Humphreys, "We need to get the contract back in our control" from Sikes. Bennis speculated that the contract could be re-assigned if they were to return the original payment for the assignment and grant Sikes a 1% overriding royalty interest.

Sikes, for his part, was evidently uninterested in either re-assigning the contract to Humphreys or negotiating with Chesapeake Energy. As Bennis was pressing Humphreys, Sikes was negotiating a deal with Range Resources Corp. on behalf of Texas Shepco. Contemporaneously, Sikes entered into a partnership agreement with R. Crist Vial on April 10, 2006, for oil and gas development. On that same day, Sikes also formed Steadfast Financial LLC, and became its

---

[3] The agreement read, in part: "Gary Humphreys and Peter G. Bennis hereby agree to participate in the development of the Mitchell Ranch project. Gary Humphreys agrees to pay Peter G. Bennis 40% of any royalty interests, ORRI [overriding royalty interests] or contract interests for negotiating this Ranch surface and mineral estate. GH will execute or cause to be executed appropriate documents to transfer such 40% interest in the amounts retained by GH in any dealing on the Ranch project."

managing member.[4]  Thereafter, Humphreys terminated the February 2006 assignment to Texas Shepco and assigned his interest in the Mitchell Ranch contract to Steadfast.  Bennis expressed frustration at the turn of events, believing that Humphreys had miscalculated, if not misled him.[5]

In purchase documents for the Mitchell Ranch, Steadfast pledged to "honor and uphold any interest Betty Lou Bradshaw is determined to be entitled to in the Property."  However, the legal and financial implications of Bradshaw's interest became of increasing concern.  In an April 12, 2006, email to Humphreys, David Shipman, an attorney for Steadfast, expressed uncertainty about "the interpretation of the Betty Lou Bradshaw deed" and the possibility that she could "bring suit" based on the deed's language.  Looking to avoid such litigation, Shipman wrote to Humphreys, "Steadfast is willing to enter into a lease agreement with yourself and honor a lease agreement for Bradshaw in the same amount in order for you to fulfill your fiduciary duty to Bradshaw as the executive mineral estate interest."  Continuing, Shipman suggested Steadfast's "best alternative to avoid litigation regarding the Bradshaw interest" would be to attain a one-fourth royalty.  As Shipman articulated the proposal, "Steadfast is willing to offer a 25% royalty interest lease agreement for your 1/16 mineral estate and two hundred thousand as a bonus payment payable upon closing."  Shipman

---

[4] Steadfast has notified the Court that its name has changed to "KCM Financial, LLC."  For consistency with the naming conventions employed in the lower courts, and to avoid confusion, we will continue to refer to KCM Financial as Steadfast for purposes of our analysis.

[5] In an email to Wayne Gifford of EXCO Resources, Bennis wrote: "It's been a fiasco.  Gary signed a document that fouled my deal and I was on the brink of litigation . . . .  Bottom line is that Range Resources is buying the whole deal land [sic] and taking a lease–they will put three wells down within the first 12 months.  I was hoping for the Chesapeake deal to make but Gary screwed up a perfectly great opportunity for us all."  Whatever Bennis's grievances had been, he appears to have been placated by a stipulation and amendment of contract executed on April 18, 2006, in which he acknowledged the assignment to Steadfast and accepted an amendment of the assignment contract that allowed him to participate in the proceeds of any subsequent sale or, if no sale closed, escrow funds.

7

also noted, however, that Bradshaw, as the non-executive interest holder, was entitled to "no Bonus Money" if the mineral estate is developed by a lessee. Sikes and Vial also acknowledged that Bradshaw would not share in a bonus.

Thereafter, a series of transactions and negotiations culminated in a mineral lease on terms that Bradshaw considered to be less than favorable, an event which precipitated the underlying lawsuit. On April 27, 2006, Steadfast closed on the Mitchell Ranch contract and, in quick succession, sold the surface estate to Range Resources and executed a mineral lease with Range Production I, L.P. (collectively, Range). Neither of the Range entities was related to or affiliated with Steadfast or Sikes, and they were represented in the transaction by separate counsel.

Under the mineral-lease terms, Steadfast reserved a one-eighth royalty and obtained a lease bonus of $7,505 per acre. Given the acreage involved, the lease bonus totaled more than $13 million for the portion of the property burdened by Bradshaw's interest. In accordance with the terms of the 1960 deeds, Bradshaw was entitled to a one-sixteenth interest in the gross production (one-half of the one-eighth royalty reserved in the mineral lease), but did not share in any part of the bonus. The remaining half of the royalty reserved in the mineral lease belonged to Steadfast.

Steadfast immediately assigned part of its one-sixteenth royalty interest to Bennis, who in turn conveyed part of his interest to Ronny Korb, a bank colleague who reportedly brokered Bennis's introduction to Humphreys. Sometime later, Steadfast assigned parts of its remaining royalty interest to R.J. and Kathy Sikes, R. Crist Vial, Greg and Pam Louvier, Roger Sikes and Christy Rome, and

8

Dacota Investment Holdings, L.L.P. (collectively, the Royalty Owners).

In January 2007, Bradshaw filed suit alleging that Steadfast, as executive, had violated its fiduciary duty to her, as a non-executive interest holder, when it entered into the mineral lease with Range. Bradshaw further asserted that Range conspired with Steadfast and aided and abetted the breach.

Although the royalty provided in the mineral lease meets the minimum royalty required by the 1960 deeds, Bradshaw asserted that a one-eighth royalty was below market in Hood County and that a one-fourth royalty had become standard. According to Bradshaw, Steadfast engaged in self-dealing by obtaining an exorbitant bonus payment at the expense of securing a higher royalty. Because Bradshaw had no interest in the bonus payment, she contends the trade-off diminished the value of her interest.

As an initial matter, Bradshaw filed a motion for partial summary judgment, arguing that the deeds provided for a "fraction of a royalty" that entitled her to a *minimum* one-sixteenth royalty, rather than a *fixed* one-sixteenth "fractional royalty." Stated more simply, Bradshaw argued that her interest established a minimum entitlement to whatever royalty was ultimately negotiated, as opposed to fixing a set royalty of one-half of a one-eighth royalty. The trial court agreed with Bradshaw, and the court of appeals affirmed in an agreed interlocutory appeal. *See Range Res. Corp. v. Bradshaw*, 266 S.W.3d 490, 491 (Tex. App.—Fort Worth 2008, pet. denied).[6]

In amended petitions filed some two years after the disposition of the interlocutory appeal,

---

[6] At this point in the litigation, there does not appear to be any dispute that the non-participating royalty interest reserved in the 1960 deeds is a fraction of a royalty that may float above the floor specified in the lease.

9

Bradshaw added fraudulent-transfer claims against the Royalty Owners, Bennis, and Korb, alleging that the transfers were made for less than reasonably equivalent value and Steadfast was insolvent or made insolvent by the transfers. *See* TEX. BUS. & COM. CODE §§ 24.005(a)(2), .006. Bradshaw further sought a constructive trust on the proceeds of the royalty interests Steadfast had transferred to them.

After considering the defendants' various traditional and no-evidence motions for summary judgment, the trial court granted a take-nothing judgment without stating its grounds. *Bradshaw v. Steadfast Fin., L.L.C.*, No. C2007009, 2010 WL 10911092 (355th Dist. Ct., Hood County, Tex. Aug. 13, 2010). The court of appeals reversed and remanded as to all claims except for those related to Bennis and Korb. 395 S.W.3d 348, 376 (Tex. App.—Fort Worth 2013).

In reversing the summary judgment, the court of appeals focused heavily on Steadfast's duty to Bradshaw and the alleged breach, which undergirds all of Bradshaw's claims. After an exhaustive discourse on the evolution of the pertinent case law, the court held: (1) Steadfast owes Bradshaw a fiduciary duty of "utmost good faith"; (2) a genuine issue of material fact exists as to whether Steadfast breached its duty to Bradshaw in negotiating the terms of the mineral lease with Range; and (3) the doctrine of estoppel by deed does not preclude Bradshaw from arguing that Steadfast breached its fiduciary duty. *Id.* at 370-371.

More summarily, the court found that Range was not entitled to summary judgment because (1) "the underlying tort—Steadfast's alleged breach of duty—is the basis for Bradshaw's civil conspiracy and aiding and abetting claims against Range" and (2) legal justification and privilege are affirmative defenses that Range did not conclusively establish. *Id.* at 372. The court likewise

10

determined that the Royalty Owners were not entitled to summary judgment on Bradshaw's constructive-trust and fraudulent-transfer claims because a fact question remained concerning whether Steadfast breached its duty to Bradshaw in the first instance. *Id.* at 375-76.

Bennis and Korb, however, fared better on appeal than the other defendants. The court affirmed summary judgment in their favor because: (1) Bennis obtained his royalty interest at the same time Steadfast executed its agreements with Range (the significance of which is not explained); (2) there is no evidence that Bennis engaged in fraud or that Bradshaw had any interest in his royalty, including the portion assigned to Korb; and (3) Bradshaw had abandoned her fraudulent-transfer claims against them. *Id.* at 376.

Although Steadfast, Range, and the Royalty Owners have petitioned this Court for review, the court of appeals' judgment in favor of Bennis and Korb is unchallenged.

## II. Discussion

### A. Standard of Review

We review a grant of summary judgment de novo. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013). In a traditional summary-judgment motion, a movant must state specific grounds, and a defendant who conclusively negates at least one essential element of a cause of action or conclusively establishes all the elements of an affirmative defense is entitled to summary judgment. *Id.* (citing TEX. R. CIV. P. 166a(c)). In a no-evidence summary-judgment motion, the movant contends that no evidence supports one or more essential elements of a claim for which the nonmovant would bear the burden of proof at trial. TEX. R. CIV. P. 166a(i). The trial court must grant the motion unless the nonmovant raises a genuine issue of material fact on each challenged

11

element. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing TEX. R. CIV. P. 166a(i)).

## B. Substantive Law on Duty

The threshold issue in this case is whether evidence exists from which a jury could conclude that Steadfast breached a duty to Bradshaw in negotiating the terms of the mineral lease with Range. Among other arguments, Steadfast contends that there is no per se duty to obtain the highest possible royalty and that, as a matter of law, it properly discharged its duty to Bradshaw by obtaining the minimum royalty required by the 1960 deeds. Bradshaw responds, however, that there is at least some evidence Steadfast engaged in self-dealing to her detriment by securing a large bonus for itself in exchange for a below-market royalty. In Bradshaw's view, Steadfast's actions are repugnant to the spirit and intent of the royalty reservation in the 1960 deeds, which she alleges expressly contemplate the non-participating royalty interest holder sharing in market increases.

The relationship between an executive and a non-executive was first described in a 1937 commission of appeals decision adopted by this Court, *Schlittler v. Smith*, 101 S.W.2d 543 (Tex. 1937). With respect to the relationship between the executive-rights holder and the non-executive, we observed in *Schlittler* that "self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved." *Id.* at 545. Importantly, we added, "Of course, there should be the utmost fair dealing on the part of the grantee in this regard." *Id.*

Thirty years later, we specifically addressed the close and dependent nature of the relationship. In *Andretta v. West*, the executive had amended the mineral lease to permit a compensatory royalty, but neither notified the non-participating royalty interest holder about the amendment nor shared the proceeds. 415 S.W.2d 638, 641 (Tex. 1967). We acknowledged that an

12

executive "has the power to make and amend leases affecting the enjoyment of a non-participating royalty interest owned by another," but said that this power gives rise to a "confidential relationship" between them. *Id.* In view of that relationship, the executive was held to be accountable to the non-executive for the latter's one-fourth share of the compensatory royalty payments. *Id.*

The executive's duty took center stage in *Manges v. Guerra*, a case involving particularly egregious acts of self-dealing by the executive. 673 S.W.2d 180, 182-84 (Tex. 1984). In *Manges*, the Guerra family owned a mineral interest in co-tenancy with Clinton Manges, who held the executive rights. Manges exercised his authority as executive to execute mineral leases on terms that were highly unfavorable to his co-tenants. Specifically, Manges made the lease with himself, agreed to a $5 nominal bonus for nearly 26,000 acres of land, and dealt with the entire mineral interest so that he received benefits that the non-executives did not receive. *Id.* The Guerras sued, arguing that Manges breached his duty to them. We agreed, observing that "[t]he duty of utmost good faith owed by an executive has been settled since *Schlittler*." *Id.* at 183. We further elaborated that "[the] duty [of utmost good faith] requires the holder of the executive right, Manges in this case, to acquire for the non-executive every benefit that he exacts for himself." *Id.* at 183-84.

In *HECI Exploration Co. v. Neel*, we described *Andretta* as having recognized a type of fiduciary relationship between an executive and a non-executive. 982 S.W.2d 881, 888 (Tex. 1998). We explained that *Andretta* held that "a fiduciary relationship exists between an owner of the executive rights and nonparticipating royalty owners in Andretta's position" because the executive has the power to make and amend the lease and thereby affect the latter's rights. *Id.*

In a more recent discussion of the issue, we reiterated that the executive owes the

13

non-executive a fiduciary duty and, relying on *Manges*, defined that duty as an obligation to "acquire every benefit" for the non-executive that the executive "would acquire for himself." *In re Bass,* 113 S.W.3d 735, 745 (Tex. 2003).

Importantly, though the relationship between an executive and a non-executive has been described as fiduciary in nature, the executive is not required to grant priority to the non-executive's interest. Although "[a] fiduciary duty often . . . requires a [fiduciary] to place the interest of the other party before his own," we have clarified that our precedent in *Andretta*, *HECI*, and *Manges* did not incorporate this requirement as part of the executive's duty. *Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 490 (Tex. 2011). Rather, as stated in *Manges*, "the executive's duty is to 'acquire for the non-executive every benefit that he exacts for himself.'" *Id.* (quoting *Manges*, 673 S.W.2d at 183). This limitation distinguishes the executive's duty from a more paradigmatic fiduciary relationship, like principal and agent. *See Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc*., 55 F.3d 181, 188 (5th Cir. 1995) ("Under Texas law, a fiduciary duty will not be lightly created, as it imposes extraordinary duties. The party owing the duty in a fiduciary relationship must put the interests of the beneficiary ahead of its own if the need arises.").

In evaluating whether an executive has breached a duty owed to a non-executive, evidence of self-dealing can be pivotal. *See*, *e.g*., *Lesley*, 352 S.W.3d at 491 (recounting the "pervasive self-dealing" involved in *Manges*). When we have declined to find a breach of the duty, we have generally observed the absence of self-dealing. *See In re Bass*, 113 S.W.3d at 745 ("What differentiates this case from *Manges*, however, is that no evidence of self-dealing exists here."). The intermediate appellate courts have proceeded similarly. *See, e.g.*, *Hlavinka v. Hancock*, 116 S.W.3d

14

412, 421 (Tex. App.—Corpus Christi 2003, pet. denied) (finding no breach due to the absence of self-dealing), *disapproved of on other grounds by Lesley*, 352 S.W.3d at 491 & n.78 (observing that executive may be liable for refusal to lease minerals "[i]f the refusal is arbitrary or motivated by self-interest to the non-executive's detriment").

Self-dealing has most commonly been observed in situations where the executive employs a legal contrivance to benefit himself, a close familial relation, or both. This was most readily apparent in *Manges*, but it has also been a feature of a multitude of other Texas cases.[7]

As the foregoing discussion alludes, the value of a non-participating royalty interest is not left exclusively to the whims of the executive. *Lesley*, 352 S.W.3d at 487 ("The law has never left non-executive interest owners wholly at the mercy of the executive."). To the contrary, while an executive may be understood to have considerable latitude, the executive lacks unbridled discretion. Our jurisprudence in this area of the law emerged in recognition of the potential for abuse inherent in this division of rights. In the absence of a fiduciary-like duty of utmost good faith and fair dealing, an ill-intentioned or indifferent executive holder could significantly compromise or extinguish the value of a non-executive interest. *Id.* ("If the exclusive right to lease the minerals could be exercised arbitrarily or to the non-executive's detriment, the executive power could destroy all value in the non-executive interest, appropriating its benefits for himself or others."). Thus, while

_____

[7] *See, e.g., Dearing, Inc. v. Spiller*, 824 S.W.2d 728, 730, 733 (Tex. App.—Fort Worth 1992, writ denied) (finding similarly); *Mims v. Beall*, 810 S.W.2d 876, 880 (Tex. App.—Texarkana 1991, no writ) (finding that self-dealing occurred when the executive entered into leases with family members or family-owned companies, at inferior terms than could be obtained through arm's-length transactions); *Portwood v. Buckalew*, 521 S.W.2d 904, 909-10 (Tex. Civ. App.—Tyler 1975, writ ref'd n.r.e.) (finding self-dealing when the executive kept overriding royalties and bonuses for itself instead of distributing them to non-executives).

15

an executive has a largely unfettered hand in negotiating and structuring a mineral lease, that discretion is circumscribed by the duty owed to a non-executive. *See Manges*, 673 S.W.2d at 183.

If the semantics surrounding the nature of this duty have shifted subtly over the years, this much is clear: An executive owes a non-executive a duty that prohibits self-dealing but does not require the executive to subjugate its interests to those of the non-executive. Thus, in ascertaining whether the executive breached its duty to the non-executive, the controlling inquiry is whether the executive engaged in acts of self-dealing that unfairly diminished the value of the non-executive interest. Although the contours of the duty remain somewhat indistinct, these tenets guide our analysis of the claims before us.[8]

## C. Breach of Fiduciary Duty

The crux of Bradshaw's claim is that Steadfast engaged in self-dealing at her expense. While the parties agree that Steadfast owes Bradshaw a duty of utmost good faith and fair dealing, they suggest that the availability of a higher royalty rate can be categorically included in or excluded from the scope of that duty. We disagree.

When an executive negotiates a mineral lease, myriad components of any given arrangement can affect the overall value of a mineral lease, including the rights to receive royalties, delay rentals

---

[8] We have acknowledged that a precise, all-encompassing definition of "fiduciary duty" has proven elusive:

Fiduciary duties are imposed by courts on some relationships because of their special nature. We recounted in *Kinzbach Tool Co. v. Corbett-Wallace Corp.* that the "term 'fiduciary' is derived from the civil law. We recognized that it "is impossible to give a definition of the term that is comprehensive enough to cover all cases." We said, "[g]enerally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction."

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) (alteration in original) (footnotes omitted).

16

and bonuses, and other provisions like the number and placement of wells. Non-executive interest holders may benefit from some but not all of these potential terms. The interests of the executive and the non-executive may therefore be aligned in some respects but not others. Knowing that to be the case, we have long held that the executive may discharge its duty to the non-executive without yielding entirely to the non-executive's best interests. To hold that the executive must obtain the highest royalty available would not only contravene our precedent, it would also unduly impinge the executive's right to make and amend leases.

Be that as it may, the going rate for a royalty interest is not altogether immaterial. When an executive has discretion to negotiate the terms of a mineral lease, and thus affect the value of the non-participating royalty interest, the executive's discretion is tempered by the duty of utmost good faith and fair dealing. As previously discussed, we have described the duty as requiring the executive "to acquire for the non-executive every benefit that he exacts for himself." *Id*. As articulated, the executive's duty is deceptively simple in its explication, but not necessarily straightforward in its application.

In the present case, it appears, at least superficially, that the executive's duty has been satisfied because Bradshaw and Steadfast enjoy exactly the same royalty under the terms of the mineral lease Steadfast negotiated with Range (one-half of a one-eighth royalty). However, the issue is more complicated than it appears at first blush because the non-executive interest is not fixed in the 1960 deeds and, instead, a minimum royalty is specified. Accordingly, (1) the executive has no discretion to negotiate a lease for less than a one-eighth royalty, which must be shared equally between the executive and non-executive; (2) the non-executive has some expectation of benefitting

17

from improved market conditions;[9] and (3) the executive is imbued with discretion in negotiating the terms of a mineral lease but must "acquire for the non-executive every benefit that he exacts for himself." Given that the executive and non-executive often do not share in all the same economic benefits that might be derived from a mineral lease (or even equally in the shared benefits), this begs the question as to how an executive could "acquire for the non-executive every benefit that he exacts for himself" without forfeiting its rights or compromising its own economic position.

Obviously, obtaining the same *royalty* in a mineral lease does not automatically equate to acquiring the same *benefit* from the mineral lease. On the other hand, the executive here indisputably holds the right to obtain benefits, such as bonuses and delay rentals, in which the non-executive has absolutely no interest. This situation thus presents a conundrum that requires balancing the bundle of rights that comprise a mineral estate. *See Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) ("There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, [and] (5) the right to receive royalty payments."). Although (and perhaps because) each stick in the bundle of rights is severable and distinct, whether the executive has obtained "every benefit" for the non-executive as it has for itself cannot be determined in a vacuum. *Cf.* R. Hemingway, Law of Oil and Gas, § 2.2 (3rd ed. 1991) ("In the exercise of the power to lease, the holder of the power is faced with decisions concerning when the power should be exercised, the general terms and conditions to be included in the

---

[9] *See* Jones, 26 Tex. L. Rev. at 576 (observing that the "common practice" of requiring "a royalty of not less than the usual 1/8" protects a non-participating royalty interest owner and "entitle[s] him to a share in any royalty, as such, in excess of the usual 1/8").

18

transaction, and whether he may reserve economic benefits in a form in which the owner of the non-participating interest will not share."). Here, the allegation is that the executive has misappropriated what would have been a shared benefit (a market-rate royalty interest) and converted it into a benefit reserved only unto itself (an enhanced bonus), with the intent to diminish the value of Bradshaw's royalty interest. If proved, such conduct is the essence of self-dealing.

When a reserved royalty is to be shared equally, as it is here, we cannot conclude that the executive's duty can be satisfied merely by obtaining some royalty or even no royalty. In either case, the royalty would be the "same" for both the executive and non-executive, but that has no meaning without reference to other benefits the executive may have secured and in which the non-executive has no interest.[10]

Moreover, because the parties here bargained for an unfixed royalty with a floor and no cap, we cannot conclude that merely obtaining the minimally acceptable royalty discharges, as a matter of law, the executive's duty. Rather, the subject transaction must be viewed as a whole in determining whether the terms of a mineral lease, including the negotiated royalty, reflect the

---

[10] This point is illustrated by the facts of *Portwood v. Buckalew*, 521 S.W.2d 904 (Tex. Civ. App.—Tyler 1975, writ ref'd n.r.e.). The dispute in *Portwood* involved heirs who, by virtue of a partition deed, had a right to participate in all royalties and bonuses for an undivided mineral estate but did not have the right to share in surface damages to the partitioned surface estate. *Id.* at 909. The surface landowners negotiated several mineral leases in which they took for themselves overriding royalties and cash bonuses classified as surface damages. *Id.* The court concluded that the record conclusively established self-dealing in the receipt of these "surface damages," citing evidence that the receipt of such substantial compensation for surface damages (1) was not customary, (2) reflected a practice almost unheard of in the industry, (3) was inconsistent with the surface-estate owner's standard practices in securing mineral leases on property not burdened by the non-executive's interest, and (4) would not reasonably have been anticipated by an ordinarily prudent landowner. *Id.* at 910, 916. Moreover, the court observed the absence of evidence indicating that royalties and bonuses could only be secured as surface damages, as opposed to royalties and bonuses inuring to the benefit of both the executive and non-executive under the terms of the partition deed. *Id.* at 918.

executive's utmost good faith and fair dealing vis-à-vis the non-executive. Although in many cases this will be a fact question, we do not foreclose the possibility that breach of duty may be determined as a matter of law, depending on the evidence in a particular case. However, we are unable to make such a determination here.

Reviewing the record in the light most favorable to Bradshaw, as we must, there is some evidence in the summary-judgment record to create a fact issue on Bradshaw's claim that the one-eighth royalty Steadfast negotiated was artificially low, the bonus Steadfast received was unusually high, and Steadfast intended to minimize the benefit shared with Bradshaw.

In response to the summary-judgment motions, Bradshaw produced evidence that, in an April 2006 email, legal counsel for Steadfast offered Humphreys a one-quarter royalty interest during negotiations for the Mitchell Ranch assignment. Moreover, the summary-judgment evidence suggests that a royalty of one-fourth was not uncommon in the area. Bennis, the bank president, testified during his deposition that royalty rates in the area had been as high as one-quarter. Bradshaw also testified via affidavit that, in July 2005, she received an offer to lease the Mitchell Ranch mineral estate for a one-fourth royalty. Bradshaw further produced five leases in which operators had agreed to pay a one-quarter royalty to landowners in Hood County near the time of the Range lease. Two of these leases with a one-quarter rate involved Range Production.

Regarding the bonus, Bradshaw produced the affidavit of a landman in Hood County who averred that the bonus was "excessive and many times higher than the lease bonuses which were usually and customarily being paid in the Barnett Shale during this time period in Hood County and the surrounding area." The landman also stated: "It is apparent that the artificially low royalty was

20

in exchange for the artificially inflated bonus." Furthermore, during negotiations, various parties openly acknowledged that proceeds from the lease bonus would not be shared with Bradshaw. Steadfast's legal counsel expressly noted that fact in his April 2006 email to Humphreys, and Vial made a similar acknowledgment in an undated letter to Sikes, ostensibly penned ahead of the April 2006 transaction with Range. Vial wrote:

> As I mentioned on the phone, there are numerous advantages to converting the 1/16th undivided mineral interest into a royalty interest. First, this interest is burdened by the Betty Bradshaw interest. Likely lawsuit if you don't lease it. Second, if no lease, then no bonus of $250,000.00 in hand. (*Note: None of which goes to Bradshaw*).

(Emphasis added.)

There is thus some evidence that a one-quarter rate was at least attainable, if not ubiquitous, and that the deal may have been deliberately structured to reduce the royalty in favor of benefits that would not be shared with Bradshaw. To be fair, there is also evidence supporting contrary conclusions and inferences, but none that we are permitted to consider in light of the applicable standard of review. Because some evidence supports Bradshaw's allegation that the mineral lease was the product of self-dealing on Steadfast's part, Steadfast was not entitled to summary judgment. We therefore affirm that portion of the court of appeals' judgment.

### D. Conspiracy and Aiding and Abetting

Range and Steadfast are not affiliated with one another except as adverse parties in an arm's-length transaction.[11] Furthermore, there is no claim that Range owes an independent fiduciary

---

[11] In her appellate brief, Bradshaw acknowledges that Range "was not a related party." By definition, an arm's-length transaction refers to "[a] transaction between two unrelated and unaffiliated parties" and may also include a transaction between closely related parties "conducted as if the parties were strangers, so that no conflict of interest arises." BLACK'S LAW DICTIONARY 1726 (10th ed. 2014).

21

duty to Bradshaw. Indeed, Texas law has never recognized a fiduciary relationship between a lessee and royalty owners. *HECI*, 982 S.W.2d at 888. This is not surprising given that the lessee's interests are inherently adverse to both the executive and a non-executive interest holders.[12] Bradshaw nonetheless contends that Steadfast's alleged breach of duty can be imputed to Range under civil-conspiracy and aiding-and-abetting theories.

We conclude that Bradshaw's derivative-liability claim against Range is untenable as a matter of law. Whether a jury ultimately determines Steadfast breached a duty to Bradshaw, we fail to discern any evidence raising a fact issue that Range was complicit in the alleged underlying tort. Rather, the uncontroverted evidence reflects that Range merely secured a mineral-lease agreement on mutually acceptable terms. In fact, Range's interests in negotiating the mineral lease were adverse to both Steadfast and Bradshaw in that Range sought to extract the best deal it could on the most favorable terms. Evidence that Range knew the estate was burdened with Bradshaw's non-participating royalty interest, may have known about tensions between Bradshaw's and Steadfast's interests, and agreed to a one-eighth royalty and an eight-figure bonus payment to Steadfast are simply insufficient to impute Steadfast's liability, if any, to Range. The evidence shows nothing more than a typical business transaction in which the parties reached a meeting of the minds as to terms mutually acceptable to both sides. Were we to validate Bradshaw's theory of liability on

---

[12] Federal courts have shown a similar unwillingness to extend fiduciary duties to adverse parties in arm's-length transactions. *See, e.g.*, *Weinberger v. Kendrick*, 698 F.2d 61, 79 (2d Cir. 1982) (noting existence of "serious obstacles" to extending fiduciary principles to arm's-length transactions). Although the Second Circuit was writing in the context of the relationship between banks and large corporate borrowers, the court rejected imposing duties in those commercial transactions because "it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table." *Id*. The same concerns are implicated in the mineral-leasing context.

such unremarkable evidence, it would be difficult to conceive of a context in which a lessee would not owe a derivative fiduciary duty to the other side of the bargaining table. An arm's-length negotiation would be essentially nonexistent, because both sides of the table would be required to balance their interests against the non-executive's interests. This is not only contrary to the limited scope of the duty we have recognized in this context, it is nonsensical.

There is also no evidence of an imbalance in the mineral-lease terms that substantially favored Range, but even if there were, that is not evidence that it acted improperly. Indeed, in a broad sense, almost any bargained-for commercial exchange might be construed as benefitting one party at the expense of another. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715-16 (Tex. 2001) ("Whenever two competitors vie for the same business advantage . . . one's success over the other can almost always be said to harm the other.").

Finally, while our determination here is guided by law and extant precedent, we are not unmindful of the considerable burdens that a contrary holding would impose on the energy industry in Texas. The Texas Oil & Gas Association argues in an amicus brief that a lessee should not be tasked—directly or derivatively—with policing the executive's duty to non-executive interest holders. Nor should a lessee be expected to give weight to a non-participating royalty interest holder's economic interests; as we have held, that is the executive's responsibility. We agree with the Association that "in negotiating with the executive, a lessee should not fear liability for doing nothing more than getting a good deal closed."

Range conclusively established that it did not owe a duty to Bradshaw in connection with its arms-length transaction with Steadfast, and Bradshaw failed to produce controverting evidence.

23

Given the dearth of evidence to raise a material fact issue, there is no justification for extending Steadfast's fiduciary duty to Range via theories of derivative liability. Accordingly, Bradshaw's claims against Range fail as a matter of law.

### E. Constructive Trust and Fraudulent Transfer

Under the terms of the 1960 deeds, Bradshaw presently holds a one-sixteenth non-participating royalty interest because the deeds reserve one-half of the royalty provided in the mineral lease, which is one-eighth.[13] Bradshaw contends, however, that she has been shorted an additional one-sixteenth royalty interest because Steadfast should have procured a one-fourth royalty. Applying the reserved fraction of a royalty (one-half) to the royalty Bradshaw contends Steadfast should have procured (one-fourth), she contends that she is actually entitled to a one-eighth royalty and has therefore been dispossessed of the additional one-sixteenth royalty. Bradshaw maintains that, to rectify the alleged loss, she is entitled to proceeds from the entire royalty provided in the mineral lease, notwithstanding the reservation in the 1960 deeds of only half of such royalty. In effect, Bradshaw lays claim to the unreserved royalty interest Bradshaw's parents conveyed with the mineral estate, which Steadfast (1) acquired as owner of the mineral estate, (2) reserved as a one-sixteenth royalty when the mineral rights were conveyed to Range by mineral lease, and (3) subsequently transferred to the Royalty Owners.[14]

---

[13] In the deeds, the grantor reserved "an undivided one-half (1/2) Royalty" of "not less than an undivided one sixteenty [sic] (1/16)" and authorized the grantee, his heirs and assigns "to lease said land for oil, gas and other minerals provided, however, that all such leases shall provide for Royalty of not less than one-eight [sic] (1/8)."

[14] Bradshaw initially claimed an interest in the portion of Steadfast's royalty interest that was transferred to Bennis and Korb, but has since abandoned that claim. Accordingly, she now seeks something less than an additional one-sixteenth interest, but the precise figures are not germane to our analysis.

24

Bradshaw seeks a constructive trust on Range's royalty payments to the Royalty Owners so that she may be placed in essentially the same position she would have occupied but for Steadfast's alleged breach. Bradshaw also claims, in the alternative, that the royalty-interest transfers should be set aside as fraudulent transfers. *See* TEX. BUS. & COM. CODE §§ 24.001–.013 (Texas Uniform Fraudulent Transfer Act or TUFTA). We address these claims in turn.[15]

A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment. *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974) ("Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice."). They have historically been applied to remedy or ameliorate harm arising from a wide variety of misfeasance. POMEROY'S EQUITY JURISPRUDENCE, 5th Ed., Vol. 4, p. 97, § 1045, *quoted in Pope v. Garrett*, 211 S.W.2d 559, 560 (Tex. 1948) ("It has been said that 'The specific instances in which equity impresses a constructive trust are numberless—as numberless as the modes by which property may be obtained through bad faith and unconscientious acts.'"). But the reach of a constructive trust is not unlimited. Three elements are generally required for a constructive trust to be imposed under Texas law. The party requesting a constructive trust must establish the following: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that

---

[15] The court of appeals reversed summary judgment on Bradshaw's constructive-trust and fraudulent-transfer claims as follows: "As we have concluded that Steadfast owed a fiduciary duty to Bradshaw and that there is a genuine issue of material fact with regard to whether Steadfast breached that duty by engaging in self-dealing and conspiring with others to Bradshaw's detriment–one of the bases for Bradshaw's constructive trust and UFTA claims against the Royalty Holders–we cannot say that they were entitled to summary judgment as a matter of law. Therefore we sustain Bradshaw's third issue in part, and we sustain her fourth issue. On remand, if the factfinder concludes that no breach occurred, then these constructive trust and UFTA issues will be moot." 395 S.W.3d 348, 376.

25

can be traced back to the original property. *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994) (applying Texas law); *see also Meadows,* 516 S.W.2d at 128-31.

In weighing the imposition of a constructive trust, a court will identify whether a wrongful taking has occurred. *See, e.g.*, *Wheeler v. Blacklands Prod. Credit Ass'n*, 627 S.W.2d 846, 851 (Tex. App.—Fort Worth 1982, no writ) ("The very nature of a constructive trust presupposes a wrongful taking by B of property owned equitably or legally by A, or to which A has some claim of right."); *Thompson v. Mayes*, 707 S.W.2d 951, 954 (Tex. App.—Eastland 1986, writ ref'd n.r.e.) (noting a suit to impose a constructive trust "is an action in equity to prevent unjust enrichment of a person who has wrongfully acquired property"). A resultant constructive trust may be placed on the property wrongfully taken or the proceeds or revenues generated from the property. *Wheeler*, 627 S.W.2d at 851. "In order to fasten a constructive trust on property owned by the defendant, some particular property must be identified as to which plaintiff has an equity." *Id.* "Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory." *Id.* The theory underlying the constructive-trust remedy is the equitable notion that the "acquisition or retention of the property is wrongful and that [the possessor of the property] would be unjustly enriched if [the possessor] were permitted to retain the property." *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied).

Bradshaw's constructive-trust claim fails because the undisputed summary-judgment evidence affirmatively negates at least one element required for the imposition of a constructive trust. Although Bradshaw asserts otherwise, the Royalty Owners' interests originate in the one-half royalty interest transferred to the mineral-interest owner by the Driskills as part of the bundle of property

rights conveyed by the 1960 deeds. The later execution of the mineral lease with Range, even if wrongful, did not convert the unreserved one-half interest into Bradshaw's property.

A constructive trust is not merely a vehicle for collecting assets as a form of damages. "Unless the tracing requirement is observed with reasonable strictness, any suit on a debt or obligation could be used to impress a constructive trust on the assets of the defendant." *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 853 (Tex. Civ. App.—Amarillo 1979, no writ). Furthermore, a constructive trust may not be imposed simply because doing so will, from an accounting perspective, make Bradshaw whole or close to whole. By seeking a constructive trust on the proceeds otherwise payable to the Royalty Owners, Bradshaw is, in essence, seeking a *whole* share of the royalty, which contravenes the express terms of the 1960 deeds. The Royalty Owners' property cannot be taken to remedy an alleged wrong simply because it would harmonize Bradshaw's ledger.[16] Bradshaw's constructive-trust claim falls short because the undisputed evidence in the record conclusively establishes that she has no interest in the royalty interest sold by her parents and held by Steadfast as part of the bundle of property rights it obtained as mineral owner. The royalty payments on which Bradshaw seeks a constructive trust emanate from that interest, which Steadfast retained when it conveyed the mineral rights to Range, and not from the one-half of royalty interest reserved by the Driskills in the 1960 deeds.

As an alternative claim for relief, Bradshaw asserted in her live petition that the

_____

[16] Bennis made this point before the trial court during the summary-judgment hearing: "As a matter of convenience, [Bradshaw] wants an additional one-sixteenth, and she would like that one-sixteenth out of what Steadfast had left over, which would necessarily include Mr. Bennis'[s] interest, but that is, again, just a mere math issue where she would be basically using a constructive trust like a—like a writ of attachment to satisfy a judgment claim she has."

royalty-interest transfers should be set aside as fraudulent because (1) Steadfast received less than a reasonably equivalent value in exchange for the transfers and (2) Steadfast was either insolvent at the time such transfers were made or became insolvent as a result of the transfers. *See* TEX. BUS. & COM. CODE §§ 24.005(a)(2), .006. Under TUFTA, a "debtor," defined as a "person who is liable on a claim," is prohibited from transferring its assets for less than reasonably equivalent value if it is insolvent or would become insolvent by virtue of the transfer.[17] *Id.* §§ 24.002(6), .003, .005(a)(2), .006. Under the Act, a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." *Id.* § 24.003(a). If the debtor "is generally not paying the debtor's debts as they become due," insolvency is presumed. *Id.* § 24.003(b); *see also id.* § 24.005(a)(2) (making transfer fraudulent as to present or future creditor when debtor lacked sufficient assets or would reasonably be unable to pay debts as they became due at the time of the transfer).

The Act is designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors.[18] "The purpose of TUFTA is to prevent debtors from defrauding creditors by placing assets beyond their reach." *Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Other than surmise and speculation, there is no evidence that Steadfast was insolvent at the time it assigned its one-half of royalty interest to the Royalty Owners or otherwise lacked sufficient assets. *See* TEX. BUS. & COM. CODE § 24.002(6), .003,

---

[17] Insolvency is not required to sustain a claim under section 24.005(a)(1) of TUFTA, which prohibits a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor"; however, Bradshaw did not allege a fraudulent-transfer claim on that basis in the trial court.

[18] The Act operates to prevent or mitigate fraudulent transfers that place a debtor's property outside of a creditor's reach. *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied) (describing a "fraudulent transfer" as "a transfer by a debtor with the intent to hinder, delay, or defraud his creditors by placing the debtor's property beyond the creditor's reach").

.005(a)(2), .006.  Nor is there evidence that it was rendered insolvent by the same.  Accordingly, Bradshaw's fraudulent-transfer claim fails as a matter of law.

### III.  Conclusion

Our decision today reaffirms a principle that has existed in our jurisprudence for eighty years: An executive owes a duty of utmost good faith and fair dealing to a non-executive and is prohibited from engaging in self-dealing in connection with the formation of a mineral-lease agreement. However, the failure to obtain a market-rate royalty does not, in and of itself, constitute a breach of that duty.  Texas law imposes no such obligation, and given the relative rights and interests that are implicated in negotiating the terms of a mineral lease, such a requirement would have the effect of depriving the executive of its exclusive right to make and amend leases.

In like manner, when a royalty reservation imbues the executive with some discretion to negotiate the royalty rate, as is the case here, the going rate for a royalty interest should be considered by the executive in exercising its discretion.  To hold that prevailing royalty rates are immaterial as a matter of law would deprive the non-executive of adequate protection.  We are not persuaded that the minimum royalty requirement in the 1960 deeds alters the analysis; if the executive has discretion to negotiate the royalty, the duty of utmost good faith and fair dealing applies because of the potential impact on the value of the non-executive's interest.  In the procedural posture of this case, we are not called upon to determine whether a breach of duty occurred as alleged.  We observe only that the record is not devoid of evidence from which a reasonable fact finder could conclude that it did.  *See Neely v. Wilson*, 418 S.W.3d 52, 76 (Tex. 2013).

However, even if Steadfast were found to have breached a duty owed to Bradshaw, on the

record before the Court its liability cannot be imputed to Range under civil-conspiracy and aiding-and-abetting theories as a matter of law. Furthermore, the Royalty Owners are entitled to summary judgment because (1) they have conclusively negated at least one element of Bradshaw's constructive-trust claim and (2) there is no evidence of insolvency, as Bradshaw has alleged in her fraudulent-transfer claim.

Accordingly, we reverse the court of appeals' judgment as to the claims against Range and the Royalty Owners and render judgment that Bradshaw take nothing on those claims. We affirm the court of appeals' judgment as to the breach-of-duty claim against Steadfast and remand to the trial court for further proceedings consistent with this opinion.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: March 6, 2015