

# NUMBER 13-17-00591-CV
# NUMBER 13-17-00593-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

## IN THE GUARDIANSHIP OF LEON R. BERNSEN, SR., AN ALLEGED INCAPACITATED PERSON

---

On appeal from the County Court at Law No. 5
of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Valdez[1]**
**Memorandum Opinion by Justice Valdez**

Dianna Bernsen and Lynn Bernsen Allison filed competing applications requesting appointment as Leon R. Bernsen's guardian. Dianna and Lynn also filed competing motions in limine challenging each other's standing to commence or contest Bernsen's

---

[1] Retired Thirteenth Court of Appeals Chief Justice Rogelio Valdez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003.

guardianship. The trial court granted both competing motions in limine and found that Dianna and Lynn both lacked standing to participate in Bernsen's guardianship.[2] In appellate cause number 13-17-00593-CV, appellants Dianna and Bernsen (the proposed ward in this case)[3] contend we should reverse the trial court's judgment granting appellee Lynn's motion in limine because there was insufficient evidence to find Dianna lacked standing. In appellate cause number 13-17-00591-CV, appellant Lynn contends we should reverse the trial court's judgment granting appellee Dianna's motion in limine on the basis that Dianna lacks standing.[4] In both causes, we affirm the trial court's judgments.[5]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Bernsen Farms and The Bernsen Family Trust

Bernsen is a ninety-four-year-old male who is the proposed ward in the guardianship proceedings at the trial court. He owned a multimillion-dollar estate comprised of cash, real property, commercial farmland, and partnership interests including an entity known as Bernsen Farms, Ltd. (Bernsen Farms or Partnership). The

---

[2] *See* TEX. EST. CODE ANN. § 1055.001.

[3] On September 26, 2018, appellee Bernsen adopted Dianna's brief and position on appeal in appellate cause number 13-17-00593-CV.

[4] Appellee Bernsen filed a brief in appellate cause number 13-17-00591-CV, and he supports the trial court's judgment that Lynn lacks standing to commence or contest his guardianship proceeding.

[5] As this point is dispositive, we do not reach Dianna's remaining issues. *See* TEX. R. APP. P. 47.1.; *In re Guardianship of Miller,* 299 S.W.3d 179, 189 (Tex. App.—Dallas 2009, no pet.) (holding that the court need not address the applicants' remaining issues having sustained a dispositive issue); *see also In re Guardianship of Benavides*, 04-13-00197-CV, 2014 WL 667525, at *2 (Tex. App.—San Antonio Feb. 19, 2014, pet. denied) (mem. op.) (holding appellant had no standing to challenge the trial court's other orders arising from the guardianship proceeding because appellant lacked standing to commence or contest a guardianship proceeding).

Bernsen Family Trust funds Bernsen Farms.[6]  Bernsen has two children:  Leon Bernsen Jr. and Dianna.  Lynn, Lea, and Garrick Bernsen are Bernsen's grandchildren, children of Leon Jr.  Virginia Means is Bernsen's sister.

## B.    Leon Jr. sues Bernsen

On July 22, 2013, Leon Jr. sued his father in district court alleging fraud and breach of fiduciary duty in Bernsen's administration of his wife's will (Anna Marie Bernsen) and the Bernsen Family Trust (district court suit).[7]  He sought relief not to exceed $30,000,000.  Bernsen filed a counterclaim to the district court suit, seeking relief between $200,000 to $1,000,000.[8]  These claims are pending in district court.

Lynn filed a petition in intervention on June 7, 2017 in the district court suit, asserting she is a beneficiary of The Bernsen Family Trust, and, thus, has an interest in the district court suit.  Lynn testified that she felt compelled to intervene in the guardianship to protect Bernsen's best interest as an intervenor.

---

[6] The Bernsen Family Trust is currently the subject of pending litigation in the 28th District Court.

[7] District Court cause no. 2013-DCV-3624-A is styled *Leon Bernsen, Jr. v. Leon R. Bernsen.*

[8] In the petition, Bernsen alleges the following (among other things):

1.    Leon Jr. leased real property from Bernsen in March 2008 and failed to pay the rental fee for three years in the amount of $9,990.  Additionally, Leon Jr. occupied the property for an additional four-year period and failed to pay the rental fee in the amount of $13,200.

2.    Leon Jr. rented equipment from Bernsen and owes $28,222.80.  Furthermore, Leon Jr. converted the equipment.

3.    Leon Jr. rented a storage barn from Bernsen for seventeen months and owes $46,750.

4.    Leon Jr. harvested the various properties and failed to provide Bernsen with proportionate shares.

These claims remain pending in district court.

## C.     Competing Applications for Guardianship

Dianna filed her first amended application for appointment of permanent guardian of Bernsen's person and estate on November 25, 2015. She attached a letter dated September 2015 from Dr. Jorge Mendizabal, a board-certified neurologist, declaring Bernsen "totally without capacity" and "unable to provide food, clothing or shelter for himself or herself, to care for [his] own physical health or to manage [his] own financial affairs." He diagnosed Bernsen with Alzheimer's Dementia with progressive cognitive decline.

On January 19, 2016, Leon Jr. contested Dianna's application and filed his own application seeking to become Bernsen's guardian while simultaneously suing Bernsen in the district court suit.

On June 22, 2016, Leon Jr.'s son Garrick also applied to become Bernsen's guardian. Dianna filed a motion in limine contesting Garrick's application on the basis that Garrick lacked standing because he held Leon Jr.'s power of attorney, which in turn obligates Garrick to carry out Leon Jr.'s interests in the district court suit. The trial court granted Dianna's motion in limine and found that Garrick did not have standing to commence Bernsen's guardianship because he held an interest adverse to Bernsen. Garrick did not appeal. Thereafter, Virginia Means, Bernsen's sister, applied to be guardian, but she withdrew her application shortly after appearing in the guardianship proceeding.

Leon Jr. filed his fifth amended petition in the district court suit on November 3, 2016, and an amended application for guardianship on November 29, 2016.

On February 03, 2017, Lynn filed an application for appointment of permanent

4

guardian of Bernsen's person and estate.  Leon Jr. died three days later.

## D.      Pleadings in the Guardianship and District Court Suit

On February 15, 2017, Dianna filed a motion in limine challenging Lynn's standing to commence or contest Bernsen's guardianship.  According to Dianna, Lynn:  (1) holds a pecuniary interest in the proceeds of Leon Jr.'s district court lawsuit; (2) takes hostile action towards Bernsen for the sole purpose of advancing her own interest; and (3) promotes Leon Jr.'s pecuniary interest in both the guardianship and the district court suit.

Lynn similarly filed a competing motion in limine asserting Dianna is disqualified from serving as guardian because she is indebted to Bernsen, unsuitable to serve, and, in turn, lacked standing because she had an interest adverse to Bernsen.  While Bernsen was suffering from Alzheimer's Dementia, Lynn claims Dianna took money and property from Bernsen.  She attached evidence to her motion demonstrating Dianna's direct conflicts of interest, which Lynn claims preclude Dianna from serving as guardian because it would harm Bernsen and Dianna would owe fiduciary duties to multiple persons, a trust, and a legal partnership.  Lynn prayed for the trial court to determine that Dianna lacks standing due to her debts, unsuitability, and disqualification.

## E.      Evidentiary Hearing

The trial court held a four-day evidentiary hearing to consider Lynn and Dianna's motions in limine and heard lengthy testimony.  Numerous attorneys participated in the hearing including Don Ford, Robert Anderson, and Kenneth Krohn (each representing Dianna); Richard Crews (on behalf of Bernsen in the district court suit); Jeff Lehrman (on behalf of the Partnership), and Doug Allison (on behalf of Lynn and Leon Jr.  in the district court suit and Lynn and Leon Jr. in the guardianship proceeding).  Various exhibits were

5

admitted into evidence, and several witnesses testified at the hearing and provided relevant evidence regarding Dianna and Lynn's lack of standing, including Dr. Nestor Praderio, M.D., Bernsen's brother Tommy Bernsen, Dianna, and Lynn. In addition, several of Dianna's e-mails were referenced to impeach Dianna's testimony.

### 1. Lynn's Testimony

Lynn testified that she did not see or interact much with Bernsen between 2012 and 2016 because of the ongoing dispute and pending litigation between Leon Jr. and Bernsen. According to Lynn, Bernsen called her a few times because he could not find his vehicle and wanted her to help him locate it at his house. Also, she went bird hunting in 2013, and when she showed him pictures of the birds, Bernsen "did not remember having a hunting place in Alice." She went over to his house a couple of times during this period, and she testified that each time he was really confused. According to Lynn, she would get calls from people who were concerned that Bernsen was lost, and Lynn needed to go get him. She last saw him at a family funeral in 2013 but claimed that "Dianna moved him out quickly . . . she didn't let him stay." At the funeral, Bernsen had a notebook with him and was taking down notes of who family members were.

### 2. Dr. Praderio's Testimony

Dr. Praderio testified by video that he is a psychiatrist specializing in geriatrics psychiatry. Bernsen appeared in his office for the first time on April 4, 2012. Dr. Praderio then evaluated Bernsen on July 25, 2012 and October 2, 2012. According to his documents, Richard Leshin, Bernsen's estate planning attorney, referred Bernsen to Dr. Praderio. His notes also indicated Dianna wanted an answer as far as Bernsen's capacity to make decisions.

6

After reviewing Bernsen's treating physician's lab records and an MRI of Bernsen's brain, Dr. Praderio diagnosed him with a depressive disorder and a neurocognitive dementia disorder—an Alzheimer's type. As his treating physician, Dr. Praderio discussed prescribing Bernsen with medication, but Dianna did not want any medications administered. As part of his evaluation process, he referred Bernsen to Dr. Amanda McBride, Ph.D., a clinical psychologist, for more testing. Dr. McBride performed psychological testing (including but not limited to a clinical interview with Bernsen, behavioral observations, the Kaufmann Brief Intelligence Test, the Motor-Free Visual Perception Test, Cognistat, Dementia Rating Scale, Wisconsin Card Sort 64, and the Color Trails Tests), and her reports were consistent with Dr. Praderio's initial diagnosis.

According to Dr. Praderio, Bernsen was at the end of the initial stage "almost getting into the moderate stage of the illness." It was his opinion that Bernsen was incompetent to: handle his bank accounts; enter into contracts; incur obligations; enter into formal legal documents of legal significance; pay, compromise, or defend legal claims made against him; collect on debts on rentals, wages, or claims owed to him; consent to governmental services; enroll in public or private residential care facilities; make employment decisions; consent to disclosure of medical records; and make decisions regarding insurance and other contracts for businesses. Dr. Praderio testified that given Bernsen's diagnosis of Dementia Alzheimer's and his incompetency, he would be susceptible to being coerced and was at risk for being unduly influenced with matters of property and wealth given that his condition was progressive and deteriorating. In fact, in just a four-month span, Bernsen had already lost about four points in his memory test,

7

and "in six months, he had already deteriorate[d] remarkabl[ly]" and would continually get worse.

On November 29, 2012, Dianna called Dr. Praderio requesting Bernsen's results. Dr. Praderio informed her of Bernsen's incompetency, all of the details of his evaluation, and Dr. McBride's evaluation addendum: "I found him not capable and I offered to [Dianna] the finding and they disappeared . . . ." Dr. Praderio testified that he offered to prepare a letter to proceed with guardianship, but "they did not show up for it."

### 3. Tommy Bernsen's Testimony

Tommy Bernsen, Bernsen's brother, testified at the evidentiary hearing by deposition taken on April 5, 2017. Tommy was handed a document that was purportedly written by him and filed with the trial court on April 13, 2017—the same day that Dianna filed the "Trustee of the Bernsen Family Trust." Tommy testified that he did not know Dianna had applied to be Bernsen's guardian, yet the document he allegedly filed appears to be a handwritten letter from him addressed to the court. The letter states that Bernsen is not completely incapacitated and that Dianna had been taking care of him and his business for several years. Thus, Dianna should be appointed Bernsen's guardian because "she already does this job and is the best person to continue to do this guardianship." Tommy reiterated that he did not write that letter; only his signature at the bottom of the document was in his handwriting, and he was perplexed regarding how it it was obtained because he had never seen that letter before and certainly did not authorize anyone to write that letter on his behalf.

### 4. Dianna's Testimony

#### i) Dianna's Initial 2015 Deposition Testimony

8

In January 2015, Dianna asserted "My father has not given anybody anything as a gift that has to do with farming . . . Everybody's got to earn it," yet in May of 2011, she claims that Bernsen handed her a check for $150,000. "I do not know what it was for except my dad wrote a check and he handed it to me and he said, I want you to have this." The memo on the check read "real estate consulting," but she testified that she has not performed real estate services for Bernsen. Thereafter, Bernsen issued a second check for the same amount for accounting work, but again, Dianna did not know what it was for. She insisted the checks were not gifts but income to "even out" what her brother Leon Jr. was taking from Bernsen. Thus, Dianna received $300,000 from Bernsen in one year—the most he had ever given her.

Dianna testified that ever since the inception of Bernsen Farms in December of 2012 (one month after Dr. Praderio diagnosed Bernsen with Alzheimer's Dementia), she would review leases and bank statements for deposits made to Bernsen Farms. For the years 2007 to 2011, however, she was not involved in this process. When asked how she became a general partner of Bernsen Farms, she said, "because somebody had to do it. I mean I was given an opportunity to be a part of it; and I said yes." She insisted that Bernsen still ran Bernsen Farms in 2013 and 2014 (despite his medical declinations) and was "doing a great job"; she was merely a partner reviewing leases and bank statements.

On November 29, 2013, Dianna claimed that Bernsen deeded properties to her to correct an error[9] when he realized those properties were not included in the formation of

---

[9] Two deeds were admitted into evidence: one dated December 18, 2012 and another dated November 29, 2013. However, Dianna asserted that there was only one transaction, which occurred November 29, 2013.

the partnership. "That's the only time there's ever been a gift to me," though she does not know all of what was conveyed to her in that gift. She purportedly did not know thousands of acres were conveyed to her. In fact, Dianna claimed the 2015 deposition was the first time she heard of such conveyance even though she signed all the relevant documents. Contrary to that testimony, in an e-mail to Leshin dated April 30, 2012, Dianna stated she reviewed the summary of the properties that would be conveyed to her, and the total acreage was 5260.89 acres.

As of January 23, 2015, Dianna stated she did not think Bernsen needed any care or support insofar as judgments about his business or how to manage Bernsen Farms; she did not think Bernsen needed help or assistance in managing The Bernsen Family Trust; and she believed Bernsen had always been, and continues to be, "fully competent to manage all of his affairs" despite Dr. Praderio's diagnosis. When asked about her involvement with the creation of the partnership in 2012, she stated: "I didn't have anything to do with that. It was my dad's plan." When asked if her father had been to a doctor in the last five years, Dianna testified that she did not know although she physically accompanied him to Dr. Praderio's office. Similarly, she "did not know" if Bernsen had any sort of diagnosis with regards to Alzheimer's Dementia, contrary to Dr. Praderio's testimony. Yet on July 25, 2012, Dianna e-mailed attorney Leshin stating Bernsen saw Dr. Praderio at 12 noon and was scheduled for a follow-up appointment with Dr. McBride on Augusut 13 and another follow-up with Dr. Praderio in September. Dr. Praderio was also the subject of numerous other e-mails from Dianna to attorney Leshin contrary to her testimony that she was unaware whether he was seen by any treating physicians or was diagnosed with any medical conditions.

10

### ii)    Dianna's 2017 Evidentiary Testimony

At the evidentiary hearing in 2017, Dianna testified that there was no tax planning done by Bernsen between 1997 and 2012.  She continued to assert that she was not involved in discussions with Bernsen or his attorney Leshin regarding the creation of a partnership, and when she was presented with multiple e-mail exchanges in 2012 between her and attorney Leshin regarding the partnership, she could not recall any of those.

In one of those e-mails dated May 16, 2012, Dianna e-mailed attorney Leshin stating, "I sent the documents regarding the partnership to Mr. Patel last week," and Leshin responds, "Dear Ms. Bernsen, I have looked through the limited partnership documents and I feel that they pretty much cover the issues that Mr. Bernsen needs to address."  Yet, according to Dianna, she was only referring to deed records and possibly to powers of attorney, not to the partnership.  In another e-mail to attorney Leshin dated June 2012 and titled "Partnership," Dianna wrote:

> I tried to explain to [Bernsen] that the partnership was a means to stave off any assaults that would result from [Leon Jr.] trying to have him declared incompetent.  I left it at that . . . At this point, I need to back off and let him think about it.

On July 24, 2012, Dianna wrote in another e-mail to attorney Leshin:  "Richard, Just an FYI.  If you do talk to Dad anytime soon don't mention the grandchildren.  He told me 'I haven't talked to them in so long I can't remember their names.'"  Similarly, on August 20, 2012, Dianna continued:

> Mr. Thompson told me that he had called [Leon Jr.] before he called me.  He told me on the phone that he was concerned that Mr. Bernsen was not getting the gist of what, he, Mr. T. was trying to explain to [Bernsen].  I don't know how much of that he told [Leon Jr.] and he said that he thought it was his fiduciary duty to call someone other than Mr. Bernsen.

11

Dianna testified she did not think this e-mail in any way suggested that Bernsen lacked understanding.

On September 7, 2012, Dianna e-mailed attorney Leshin asking, "Maybe we should get dad to sign the papers, the partnership, the will, and then if Dr. Praderio finds him competent get him to sign updated ones . . . I am concerned because Dr. P. keeps pushing this appointment back," although Dianna had previously stated that she "never saw any will" and was unaware Bernsen had been seen by a physician.

On October 1, 2012, Dianna stated that she and Bernsen had a 1:30 appointment tomorrow with Dr. Praderio, and she was "sitting here biting my nails over this because we're at the end of the year, my dad's getting old . . . ." Dianna testified that she was concerned with her inheritance: "So we're looking at the end of the year here and we wanted these partnership papers signed to protect not only the property . . . in his estate but the inheritance of [Leon Jr.] and me and Lynn and Lee and Garrick . . . ."

She accompanied Bernsen to Dr. Praderio's appointment in October 2012 and asserted that although numerous tests were conducted on Bernsen, she was not looking for a capacity evaluation; she was only looking "for [Bernsen's] ability to sign documents." Contrary to Dr. Praderio's testimony, Dianna claims that Dr. Praderio never gave her that evaluation, nor did Dr. Praderio ever offer her a guardianship letter. Further, Dianna testified that on November 28, 2012, Dr. Praderio told Dianna, "The results of Dr. McBride's tests are on my desk and I have not looked at them." She asked him when they would be ready, and he said, "Oh, early December." Dianna stated that is "pretty much" all she remembers from her conversation with Dr. Praderio, but she believes that Dr. Praderio must have "her dad mixed up with another patient" because his testimony is

12

not "really accurate"—even though Dr. Praderio testified with Bernsen's records and test results in front of him.

On December 10, 2012, Dianna's e-mail sets forth, "I think we should sign the docs and let them try to prove incompetence." One week later, Dianna attempted to get Bernsen to sign the partnership papers, updated will, and powers of attorney: "I've been working on him all weekend. I will let you know as soon as I can so you can rebook the time in the morning." According to Dianna, Bernsen wanted to wait for Dr. Praderio to finish his competence exam before signing the documents, but Dianna told Bernsen that Dr. Praderio was very unresponsive. The very next day, however, Bernsen signed the medical and statutory powers of attorney, appointed Dianna as his power of attorney, and signed his last will and testament.

Shortly after Bernsen signed the documents in question, on December 18, 2012, Bernsen signed a deed, which gave Dianna one percent of all the property in Bernsen Farms. Bernsen also created the limited partnership, which is pending in district court.[10] As a result, Dianna and Bernsen became general partners of Bernsen Farms, and if Bernsen were ever to be declared incompetent, Dianna would now be in sole control of the Farms. On December 29, 2013, Bernsen signed another gift deed gifting more acreage to Dianna.

## F.    Trial Court Ruling

---

[10] The partnership agreement states:

> If there is a judicial determination by a court of competent jurisdiction that a General Partner is mentally incompetent to manage his person or property, then such incompetent General Partner . . . shall automatically cease to be a general partner of the Partnership at the time of such determination.

13

At the end of the hearing, the trial court expressly provided that Dianna "lacks standing in this matter and has an interest adverse" to Bernsen and that Lynn "lacks standing in this matter as she has interests that are adverse to [Bernsen]." It further ordered that neither Dianna or Lynn may file applications to create a guardianship for Bernsen; contest the creation of a guardianship; or contest the appointment of a person as guardian pursuant to section 1055.001 of the Texas Estates Code. *See* TEX. EST. CODE ANN. § 1055.001. Thus, neither Dianna nor Lynn could participate in any fashion in Bernsen's guardianship proceeding at any stage. Dianna and Lynn both timely appealed.

## G. Post-judgment Motions

Leon Jr.'s daughter Lea, as next friend of Leon Jr., filed a motion for the trial court to inspect and approve in camera a settlement of all claims against Bernsen in the district court suit. Lynn's counsel, on behalf of Lynn, also filed a motion to approve this settlement, which sought to award Lea and Lynn Bernsen $4,000,000 in cash and equities along with a one-half interest in trust assets. Bernsen, Bernsen Farms, and Dianna filed their objections to the purported settlement agreement.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

"The issue of whether a party has standing to participate in a guardianship proceeding is a question of law" which we review de novo. *In re Guardianship of Miller*, 299 S.W.3d 179, 188 (Tex. App.—Dallas 2009, no pet.). "When standing has been conferred by statute, the statute itself should serve as the proper framework for a standing analysis." *In the Interest of K.D.H., a Child*, (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig.

14

proceeding [mand. denied]). Section 1055.001 of the Texas Estates Code, entitled "Standing to Commence of Contest Proceeding" provides that a person who has an interest adverse to a proposed ward or incapacitated person is not entitled to file an application to create a guardianship, contest the creation of a guardianship, contest the appointment of a person as guardian, or contest an application for complete restoration or modification of a ward's guardianship. *See* TEX. EST. CODE ANN. § 1055.001(b). Because the Estates Code does not define what constitutes an interest adverse to the proposed ward, we must look to its ordinary meaning and appellate court decisions addressing standing challenges to formulate an understanding of how the term has been applied in different contexts. *See In re Guardianship of Miller*, 299 S.W.3d at 189. "Adverse interest" is defined as "an interest that is opposed or contrary to that of someone else." *Adverse interest*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In *Allison v. Walvoord*, the El Paso court of appeals held that the plaintiffs lacked standing to contest a guardianship proceeding because they were not interested in the welfare of the proposed ward. 819 S.W.2d 624, 625 (Tex. App.—El Paso 1991, no writ). The plaintiffs' interest was in obtaining a substantial judgment against the proposed ward "which could only adversely affect his welfare." *Id*.; *see also In re Guardianship of Benavides*, No. 04-13-00197-CV, 2014 WL 667525, at *1 (Tex. App.—San Antonio Feb. 19, 2014, pet denied) (mem. op.) ("[A] person who is suing a proposed ward or incapacitated person has an interest adverse to the proposed ward or incapacitated person."); *In re Guardianship of Valdez*, No. 04–07–00712–CV, 2008 WL 2332006, at *2 (Tex. App.—San Antonio June 4, 2008, pet. denied) (mem. op.). (same); *In re Guardianship of Olivares*, No. 07-07-00275-CV, 2008 WL 5206169, at *2 (Tex. App.—

15

Amarillo, Dec. 12, 2008, pet denied) (mem. op.) (holding that evidence of self-dealing is evidence of an adverse interest); *Betts v. Brown*, No. 14–99–00619–CV, 2001 WL 40337, at *4 (Tex. App.—Houston [14th Dist.] Jan. 18, 2001, no pet.) (mem. op.) (generally defining an adverse interest as an interest that adversely affects the proposed ward's welfare of well-being of the proposed ward).

The Dallas Court of Appeals held that debt alone does not automatically create an interest adverse to ward that would divest that person of standing to file an application to create or contest a guardianship "without evidence of the amount of the debt in relation to the estate of the ward or proposed ward, the ability or inability of the proposed guardian to repay the debt, or some other evidence such as misuse of funds to the detriment of the ward or proposed ward." *In re Guardianship of Miller*, 299 S.W.3d at 189. In *Miller*, the court of appeals did not determine if debt of $100,000 was sufficient to preclude standing because in that case there was no evidence showing the applicant was indebted to the proposed ward. *Id*. To the contrary, the record only showed that a business was indebted to the proposed ward, and there was "no evidence regarding the ownership or control" of the business and "no evidence that the [applicant] owned any interest in the [business]". *Id*.; *see also In re Guardianship of Olivares*, 2008 WL 5206169, at *2 (holding that an applicant had an interest sufficiently adverse to the ward because "a factfinder could reasonably conclude that though [the applicant] has the ability to earn wage and care for himself, he opted to live off his potentially incapacitated mother and expend her finite estate for his own benefit . . . [and] much of this self-dealing occurred after he became her fiduciary via a power of attorney).

In *Parker*, the ward claimed the applicant held an interest adverse to hers because the applicant sought to control the ward's trust. *In re Guardianship Parker*, 275 S.W.3d 623, 632 (Tex. App.—Amarillo 2008, no pet.). The trial court denied the ward's motion in limine, and the Amarillo Court of Appeals affirmed. *Id*. The court held that evidence was insufficient to establish the applicant sought to gain control of the ward's trust and had an interest "adverse" to the ward where the only evidence the ward produced was testimony of the applicant's son that he "assumed" the applicant was concerned about her inheritance. *Id*. He assumed the applicant was concerned about her inheritance because the applicant made a comment that loans were made from the trust, and the applicant was unsure if the loans were repaid. *Id*. Thus, the applicant was not a "person with an interest adverse the proposed ward." *Id*.

### III.    LYNN'S MOTION IN LIMINE

In appellate cause number 13-17-00593-CV, Dianna argues that we should reverse the trial court's judgment granting Lynn's motion in limine because the trial court's judgment that Dianna lacks standing is not supported by sufficient evidence.

#### 1.  Dianna Knew about Bernsen's Illness in 2012

After reviewing the record, Dianna's testimony suggests that in June, July, and August 2012, Dianna knew Bernsen was suffering from some measure of incapacity. In November 2012, Dr. Praderio diagnosed Bernsen with Alzheimer's Dementia and declared him incapacitated. When Dr. Praderio provided Dianna with his diagnosis and offered to draft a guardianship letter, Dianna "disappeared," did not take Bernsen to his follow-up appointment, and never contacted Dr. Praderio or his staff again. Although Dr. Praderio discussed prescribing Bernsen medication, Dianna did not want any medications

administered. Despite Dr. Praderio's diagnosis that Bernsen's condition would continually deteriorate, three years later, Dianna continued to assert that her father was "fully competent to manage all of his affairs" and insisted that Bernsen still ran the company in 2013 and 2014 and was "doing a great job." Moreover, Dr. Praderio provided compelling testimony about his interactions with Dianna, yet Dianna denies that such conversations ever took place. She refused to acknowledge Dr. Praderio's findings and asserted that he must have Bernsen confused with another patient because his testimony was inaccurate. Thus, it can be inferred that Bernsen was not treated for his illness, and Dianna was not concerned with Bernsen's well-being. *See* TEX. EST. CODE ANN. § 1001.001 ("A court may appoint a guardian . . . only as necessary to promote and protect the well-being of the incapacitated person); s*ee also In re Guardianship of Jones*, No. 02-15-00367-CV, 2016 WL 4474353, at *9 (Tex. App.—Fort Worth Aug. 25. 2016, no pet.) (mem. op.) (holding that granting a motion in limine as to standing is harmless where the evidence is sufficient to support the trial disqualification findings).

### 2. Dianna Deceived Bernsen

An understanding of the timing of Dianna's actions is critical to our analysis. The record provides that most of Bernsen's "gifts" to Dianna—the securement of Dianna's one percent interest in Bernsen Farms, the creation of the partnership, and the power of attorney documents were signed immediately after Dianna learned of Bernsen's lack of capacity and right after Dianna "had been working on Bernsen all weekend." Only one month after Dr. Praderio declared Bernsen incapacitated, Dianna's e-mails establish that she created the partnership contrary to her testimony. When Dianna was presented with

18

the partnership e-mails, she continued to claim that she was only referring to deed records and possibly to powers of attorney.

After Dianna, in her own words, "had been working on [Bernsen] all weekend," Bernsen signed the partnership agreement, new will, and powers of attorney appointing Dianna as his guardian. Dianna's own expert, Dr. Mark Kunik, M.D., testified that Dianna's comment "hints of coercion," raises a red flag, and would cause him to investigate to make sure there "are safeguards in place so that [his] patient was not inappropriately coerced." He testified that he would have probably called Adult Protective Services. Thus, based on the record before us, the trial court could reasonably have concluded that Dianna coerced Bernsen's signatures on several legal documents while she had actual knowledge of his incapacity, and that she instituted these actions solely for her own benefit. *See id*.

### 3. Dianna's "gifts" are Pending in Litigation

On February 13, 2017, Dianna filed a "Trustee of the Bernsen Family Trust" in the district court alleging that Bernsen had resigned as trustee on May 19, 2015 and attached Bernsen's alleged resignation letter. As a result, Dianna is currently the sole trustee of The Bernsen Family Trust. Moreover, Dianna is the sole general partner of Bernsen Farms, which according to Lynn, holds more than six thousand acres of incredibly valuable farm property. Thus, the trial court could have determined that Dianna's ownership interest in The Bernsen Family Trust and Bernsen Farms is adverse to Bernsen. *See In re Guardianship of Miller*, 299 S.W.3d at 189 (concluding that the trial court erred in finding the applicant lacked standing where there was no evidence regarding the ownership or control of the subject property and no evidence that the

19

applicant owned any interest in the subject property). Here, the trial court could have concluded that Dianna acquired legal title of Bernsen's assets for the purpose of obtaining control of the same after Dianna knew that Bernsen no longer had the ability to responsibly execute these documents due to his lack of capacity. *See Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 439 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("A fiduciary duty requires the fiduciary to place the interest of the other party above his own."); *see also In re Guardianship of Olivares*, 2008 WL 5206169, at *2 (holding that self-dealing after becoming a fiduciary via a power of attorney is an interest adverse to the ward).

Moreover, both gift deeds (one dated December 2012 and another dated November 2013) conveyed to Dianna as separate property and an undivided one percent interest in real property are presently pending in dispute in the 28th Judicial District Court. Thus, Dianna is presently involved in some sort of litigation adverse to Bernsen in the district court. *See Allision*, 819 S.W.2d at 627 (holding that litigants with a potential legal claim against the proposed ward did not have standing to participate in the ward's guardianship proceeding).

### 4. Dianna's Testimony is Discredited

On numerous occasions, Dianna's testimony wad discredited. She disagreed that some of her 2015 deposition testimony was untruthful and claimed it was "uninformed." For example, she claimed she was unaware Bernsen gifted over 5,000 acres of valuable farming property to her even though she testified that Bernsen "does not give things away," and the first time she heard of such a "gift" was at the 2015 deposition. However, Dianna's e-mails directly contradicted this testimony. Dianna continued to assert that she

20

was unaware Bernsen had been diagnosed with any illnesses, and she could not recall any of her e-mails with attorney Leshin about Dr. Praderio. Dianna was also adamant that Bernsen continued to run the partnership and was fully competent to manage his affairs three years after Dr. Praderio diagnosed him with Alzheimer's Dementia. Despite being confronted with her e-mails regarding her role in the creation of the partnership, legal documents, and Bernsen's will, Dianna continued to assert she was not privy to such information and did not participate. Dianna testified that she did not recall being sent a copy of her father's proposed will even though Dianna's testimony regarding her e-mails established that on March 5, 2012, attorney Leshin sent Dianna the proposed estate planning documents along with Bernsen's proposed will.

The trial court also heard Tommy, Bernsen's brother, testify that he did not draft a letter that was allegedly written by him requesting that Dianna be appointed as Bernsen's guardian and was unaware that Dianna sought to become Bernsen's guardian. The letter was filed by Dianna. Thus, the trial court could have inferred that at Tommy's expense, Dianna concocted the instrument to sway the trial court into awarding her guardianship. Given the evidence of Dianna's contradictory testimony, we cannot hold that the trial court erred in determining that Dianna had an interest sufficiently adverse to her father to bar her from participating in his guardianship proceeding, and we presume the trial court reconciled conflicting evidence in favor of its ruling. *See Avary v. Bank of America, N.A.*, 72 S.W.3d 779, 791 (Tex. App.—Dallas 2002, pet denied) ("A fiduciary "owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability."); *see also In re Guardianship of Olivares*, 2008 WL 5206169, at *2 ("Given the evidence of his

21

self-dealing, we cannot hold that the trial court erred in determining that Olivares had an interest sufficiently adverse" to the proposed ward.).

### 5. Dianna has Self-conflicting Fiduciary Obligations

As general partner for Bernsen Farm and sole trustee of the Bernsen Family Trust, Dianna owes fiduciary duties to these establishments along with their beneficiaries. If awarded guardianship, Dianna also would owe a fiduciary duty to Bernsen. Section 1055.001 was designated to "protect the well-being of the individual" and "those with an adverse interest can hardly qualify as being persons interested in protecting his well-being." *Allison*, 819 S.W.2d 624. As guardian of Bernsen's person and estate, Dianna would be obligated to place his interest above her position as general partner of Bernsen Farms and Bernsen Family Trust. Also, it can be inferred that by seeking guardianship of Bernsen's person and estate, Dianna does not want to avoid any potential conflicts of interest The Bernsen estate might pose on her. As Lynn argued, "one person cannot loyally serve multiple masters with competing agendas." The purpose of the partnership is to "make profits, preserve capital, increase wealth," and Dianna's role as Bernsen's guardian would create contradicting roles. *See Avary v. Bank of America, N.A.*, 72 S.W.3d 779, 791 (Tex. App.—Dallas 2002, pet denied); *see also In re Guardianship of Olivares*, 2008 WL 5206169, at *2. Given the evidence of Dianna's self-dealing, which occurred after Dr. Praderio determined Bernsen was incompetent, we conclude that the trial court did not err in determining Dianna had an interest sufficiently adverse to Bernsen to bar her from participating in the guardianship proceeding. *Id*.

### 6. Summary

22

After reviewing the record, we cannot support Dianna's position that "no evidence exists to support the trial court's [implied] findings that Dianna is indebted to Mr. Bernsen or holds adverse interests as a result." Contrary to Dianna's assertion, the record provides overwhelming evidence that Dianna is abusing the powers and control that she bestowed on herself after Dr. Praderio determined Bernsen was incompetent and informed Dianna of such. Because we affirm the trial court's order granting Lynn's motion in limine and find that Dianna lacks standing to commence or contest this guardianship proceeding, we conclude that Dianna similarly has no standing to challenge the trial court's orders arising from the guardianship proceeding in this appeal. *See In re Estate of Denman*, 270 S.W.3d 639, 642 (Tex. App.—San Antonio 2008, pet. denied) (an appealing party does not have standing to complain of errors that merely affect the rights of others); *see also In re Guardianship of Benavides*, 2014 WL 667525, at *1. Accordingly, we overrule Dianna's issue. *See* TEX. R. APP. P. 47.1.

## IV. DIANNA'S MOTION IN LIMINE

In appellate cause number 13-17-00591-CV, by her sole issue, Lynn asserts the trial court erred by finding that Lynn has interests adverse to Bernsen and thus lacks standing to serve as his guardian.

### A. Lynn Holds a Pecuniary Interest in Leon Jr.'s District Court Suit

Lynn testified that she has three sources of financial interest in the district court suit. In response to Dianna's assertion that Lynn lacks standing to commence a guardianship proceeding, Lynn allegedly disclaimed all rights to inherit money and property through Leon Jr.'s estate from any judgment in the district court suit because she wanted "to be disassociated from the lawsuit between my dad and my grandfather."

23

However, Lynn did not file the disclaimer with the County Clerk of Nueces County. *See* TEX. EST. CODE ANN. § 240.102 (providing that a disclaimer must be delivered to the personal representative of the decedent's estate or filed in the official public records of the county in which the decedent was domiciled or owned real property); TEX. LOC. GOV'T CODE ANN. § 191.001(b). The record provides that Lynn merely "filed" this disclaimer in response to Dianna's motion in limine. Thus, the trial court could have concluded that Lynn's adversity cannot be altered by the disclaimer as it has no legal effect. Moreover, Lynn's purported disclaimer does not purport to disclaim Lynn's interest in The Bernsen Family Trust. Therefore, the trial court could have found that far from excluding herself from the district court suit, Lynn continues to maintain positions that are adverse to Bernsen.

Nonetheless, even if we assume that Lynn's disclaimer is legally valid, Lynn testified that any specific inheritance from the district court suit would transfer to her children: a sixteen-year-old and an eighteen-year-old. Here, the trial court could infer that Lynn is placing the welfare of her children above Bernsen. *See* TEX. FAM. CODE ANN. § 151.001(a)(4) (providing that a parent has the duty to manage the child's estate); s*ee also In re Guardianship of Olivares*, 2008 WL 5206169, at *2 (finding an adverse interest when the applicant has the ability to earn wages and care for himself, yet he opted to live off his potentially incapacitated mother and expend her finite estate for his own benefit). Because Lynn is still actively engaged in the district court suit, and because she has not attempted to dismiss the district court suit, it can be inferred that she is not concerned in placing Bernsen's interests above her own. Thus, the trial court could have determined that Lynn is an adverse party in an ongoing proceeding as Lynn did not file a disclaimer

24

or a motion to dismiss the district court suit. *See Allison*, 819 S.W.2d at 627 (holding that litigants with a potential legal claim against the proposed ward did not have standing to participate in the ward's guardianship proceeding).

**B.    Lynn Accuses Bernsen of Misconduct and Fiduciary Breaches**

Lynn adopts many of Leon Jr.'s allegations against Bernsen in her motion in limine. Specifically, Lynn accuses Bernsen of "fiduciary misconduct" in what according to her, "may seem like a prolonged discussion about [Bernsen] and his many breaches of fiduciary duties owed to The Bernsen Family Trust (including duties owed to [Leon Jr.], and his children (Lynn Allison, Lea Bernsen, and Garrick Bernsen)":

- failing to include The Bernsen Family Trust in tax returns;

- refusing to file required tax returns for the years 2005-2011;

- failing to set up bank accounts to segregate The Bernsen Family Trust;

- terminating The Bernsen Family Trust;

- filing late tax returns for the years 2004-2010 for The Bernsen Family Trust;

- giving false testimony about Anna Marie's will;

- filing legal documents distributing the trusts to himself;

- depriving The Bernsen Family Trust of seven years' worth of income; and

- forming Bernsen Farms.

Lynn claims she will "never enjoy any ownership of those farm and ranch properties" because of Bernsen's alleged breaches of fiduciary duties and claims she "would have received millions of dollars' worth of farm and ranch properties upon the date of [Bernsen's passing]" without such breach. In addition, Lynn's pleadings state she will "have absolutely no say whatsoever in the management or control of the farm and ranch

25

properties" or "be compensated for work or services provided for the benefit of the Bernsen Family Trust" whereas she would have received "millions of dollars['] worth of farm or ranch properties upon the date of [Bernsen's] passing." Thus, Lynn's own pleadings in the guardianship proceeding demonstrate her a hostile position towards Bernsen as she recites the same claims as Leon Jr., who sued Bernsen for $30,000,000. While Lynn laments her losses due to Bernsen's "breaches," the trial court could have inferred that Lynn stepped into Leon Jr.'s shoes by adopting verbatim his allegations against Bernsen, and Lynn's intention as Bernsen's guardian is to accomplish the same goals as her father Leon Jr. Thus, the trial court could have concluded that Lynn has an adverse interest because she adopted a hostile position to Bernsen. *See id.*; *see also In Re Guardianship Gilmer*, WL 3616071, at \*8 ("Because the plaintiffs [in the lawsuits] were not interested in protecting the proposed ward's well-being, the El Paso court held the plaintiffs lacked standing.").

## C. Lynn Accuses Bernsen of Crime or Fraud

While seeking to become Bernsen's guardian, Lynn further accuses Bernsen of committing a crime or fraud. Dianna at one point attempted to seal her communications with attorney Leshin claiming she was a representative of Bernsen and asserted attorney-client privilege. Bernsen similarly objected to the disclosure of communications also claiming privilege. However, Lynn asserted that the communications between Dianna and attorney Leshin may be disclosed pursuant to the crime-fraud exception arguing that the communications are not privileged if attorney Leshin enabled or aided Bernsen to commit or plan to commit a crime or fraud. Because Lynn's pleadings and allegations are hostile to Bernsen, the trial court could have found that Lynn holds an adverse

26

interest. *See id.*; *see also In re Guardianship of Benavides*, 2014 WL 667525, at *1 (holding that a person who is suing a proposed ward or incapacitated person has an interest adverse to the proposed ward).

## D. Lynn's Poor Judgment

On numerous occasions, Lynn asserted that she was very upset to learn of the district court suit and that her father sued Bernsen. Although the thought of Leon Jr. suing Bernsen in the district court suit troubled her, Lynn nevertheless sought and hired the very same attorney that represents Leon Jr. in his suit against Bernsen. Lynn's counsel in this case represents:

- Leon Jr. in the district court suit against Bernsen;

- Leon Jr. in his guardianship application (while simultaneously suing Bernsen in district court suit);

- Lynn in the district court suit as an intervenor (and approving the proposed settling agreement); and

- Lynn in the guardianship proceeding.

Moreover, Lynn's counsel's law partner represents Lea as next of friend of Leon Jr. in the district court suit.[11] Thus, Lynn specifically sought counsel that represents parties suing Bernsen in both the district court suit and the guardianship proceeding. The trial court could construe Lynn's action as the comingling of different interests, which is adverse to Bernsen.

## E. Lynn Seeks to Dissolve Bernsen Farms

Lynn testified that she seeks a dissolution of Bernsen Farms and an implementation of a constructive trust, and she is aware that this would result in a

---

[11] We note that Bernsen's sister, Virginia, was also represented by the same attorney but withdrew her application shortly after she appeared in the guardianship proceeding.

27

personal liability for Bernsen. *See KCM Financial LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) ("The party requesting a constructive trust must establish the following: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property."). Under Lea's proposed settlement agreement, which Lynn supports, The Bernsen Family Trust would be partitioned into two new and distinct trusts. One trust would grant Lea and Lynn a one percent general partnership interest in Bernsen Farms, along with $4,000,000 in cash, stocks, and equities. The trial court could have found that this is an adverse interest that is contrary to Bernsen.

Moreover, Lehrman filed a joinder in the trial court in support of the motion in limine against Lynn on behalf of the partnership. At the hearing, he argued the following:

> [Lynn] is now carrying on the attack that [Leon Jr.] originally raised against [Bernsen] in the 28th District Court. She has now taken that over. That's huge, Judge . . . it will have enormous tax consequences on the estate, Judge. On the ward . . . if the [Partnership] is somehow dismantled. It will also have extreme personal liability exposure with respect to personal liability for the family. And, finally it will also divest any personal protection, any shielding of assets to creditors.

Thus, the trial court could have believed that Lynn holds an interest adverse to Bernsen because the lawsuit against the partnership and the proposed settlement agreement, which she supports, could only adversely affect Bernsen but benefit her. *See* TEX. EST. CODE ANN. § 1104.351 (providing that a person may not be appointed guardian if the person asserts a claim adverse to the proposed ward or the proposed ward's property). Additionally, the trial court could have inferred that by seeking guardianship of Bernsen's person and estate, Lynn did not want to avoid any potential conflicts of interest the Bernsen estate might pose on her.

28

## F. Summary

Given the record before us, we cannot hold that the trial court erred in concluding Lynn lacked standing to participate in Bernsen's guardianship proceeding. We conclude that the evidence supports the trial court's finding that Lynn has an interest contrary to Bernsen's well-being. Finally, we note that Bernsen's district court counsel adopted Dianna's brief and position on appeal that Lynn lacks standing to participate in Bernsen's guardianship proceeding. Thus, we overrule Lynn's sole issue.

## V. CONCLUSION

Having overruled Dianna and Lynn's issues, we affirm the judgment of the trial court in both cause numbers.[12]

ROGELIO VALDEZ,
Justice

Delivered and filed the
8th day of August, 2019.

---

[12] On December 13, 2018, Bernsen filed a "Motion for Protective Order and to Preserve Claims of Privilege" with this Court. On February 22, 2019, he filed a "Supplemental Motion for Protective Order" with this Court. Bernsen's motion in our Court was contingent on our reversal of the trial court's judgment. However, because we affirm the trial court's determination that Dianna and Lynn lack standing to commence or contest this guardianship proceeding, we dismiss Bernsen's motion. *See Bland v. Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–555 (Tex. 2000) ("Standing is a prerequisite to subject-matter jurisdiction, and subject-matter jurisdiction is essential to a court's power to decide a case."); *see also In re Guardianship of Benavides*, 04-13-00197-CV, 2014 WL 667525, at *1 (Tex. App.—San Antonio Feb. 19, 2014, pet. denied) (mem. op.).

29