

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

No. 08-24-00217-CV

Charles Mais, Jr., Appellant

v.

Linda Marie Mais, Appellee

On Appeal from the County Court at Law No 3
El Paso County, Texas
Trial Court No. 2022DCV3010

## MEMORANDUM OPINION

Linda Marie Mais sued her uncle, Charles Mais, Jr., alleging fraud, breach of a fiduciary

relationship, and intentional infliction of emotional distress (IIED). A jury found in her favor and

imposed a constructive trust on the real property in question.[1] It also awarded $200,000 in damages to Linda based on her IIED claim. On appeal, Charles brings multiple issues challenging the judgment entered against him. We affirm the imposition of a constructive trust on the real property, and reverse and render a take nothing judgment on the IIED claim.

## I. FACTUAL BACKGROUND

In October 2022, Linda and her former spouse, Luis Nava, sued Charles, a practicing attorney.[2] Their lawsuit concerned the purchase of real property located at 8026 San Jose Road, El Paso, Texas 79915 (the Property). The case proceeded to a jury trial where Linda testified that, beginning in 2004, Charles had provided legal counsel to her and her former husband for a variety of legal matters. Again, in 2007, she sought Charles's expertise—both as an attorney and as a licensed real estate agent—regarding selling her house and purchasinh of a new property. She described that she had found a house to buy but financing was offered at a very high interest rate. At the time, she relied on disability income as her only income. Charles offered to help her by co-signing on the loan.

Linda testified she paid a $10,000 down payment withdrawn from her bank account and she signed and initialed the purchase documents provided to her at the title company. She testified to the jury that she believed she was the owner of the Property "in addition to [Charles] being a co-signer," and she believed that the Deed of Trust established her ownership. She acknowledged

---

[1] Appellant Charles Mais, Jr., is an uncle to Appellee Linda Marie Mais. Because they share the same surname, we use their first names to distinguish between them. Additionally, documents prepared by Charles, including the notice of appeal, spell Linda's middle name as "Maria." A reasonable inference from the record is that the spelling is a typo and we refer to her middle name as "Marie."

[2] Although Nava had initially joined the suit as a plaintiff, a directed verdict was granted against him and the trial court entered a take-nothing judgment in favor of Charles. Nava does not appeal that ruling and he is not a party to this appeal.

that she read the documents she signed only "[t]o a certain degree." According to Linda, Charles had acted as both her uncle and her attorney at the time she entered into the transaction.

The evidence admitted at trial showed that, on April 20, 2007, Linda signed a residential sales contract as a buyer of the Property. Both Linda and Charles also testified the document was later amended to add Charles "as a purchaser" of the property.[3] On May 2007, a Deed of Trust was signed by Linda and Charles. It showed Linda and Charles as borrowers and Homecomings Financial, LLC (f/k/a Homecomings Financial Network, Inc.) as the lender. Linda said that when she signed the Deed of Trust, she believed it served several purposes: that it protected her interest in the Property; it meant she was buying the house; it identified her as the owner of the property; and she signed it in her capacity as an owner. However, the General Warranty Deed only listed Charles as a grantee of the conveyance of title. The General Warranty Deed stated the grant was done in "further consideration of the execution and delivery by [Charles]" of a promissory note in the amount of $189,952 payable to the order of Homecomings Financial, LLC (f/k/a Homecomings Financial Network, Inc.).

Linda testified that, sometime after 2010, Charles told her he was going to get the house refinanced to obtain a better interest rate and it was not necessary for her to accompany him. In 2016, Charles approached her asking that she take him off the loan. At that time, he did not ask for any money in return. The effort failed after she learned that her name was not on any of the ownership documents.

She tried to refinance again in 2018. Charles asked for increasing amounts of money in exchange for him signing off on the paperwork. First he asked for $10,000, then $16,000, and

---

[3] Our record does not contain a document showing an "amendment."

finally $20,000. Charles explained to her that he had increased the price because years had passed during the time she initially attempted to refinance. But Linda also testified that a loan officer contacted Charles to sign papers for the refinance and he refused. He told her the papers failed to provide for her $20,000 payment to him. In the most recent attempt to refinance, Linda's son asked Charles how much money he wanted to be paid. Charles then responded he needed "at least $80,000," as an owner of the Property.

Linda testified she made all the mortgage payments directly to the mortgage company from 2007 to 2021.She also described that the Property covered almost two acres of land containing well over 20 pecan trees and fruit trees, which required a lot of money to maintain. Linda said that "[e]very remodel, every payment, every repair was made" by her and she had receipts for everything. Over the years, the house had needed extensive repairs, and she spent over $75,000 on remodeling expenses.

She noted that circumstances changed in September 2021. She suddenly found she could no longer make payments "directly through the app," as per her usual practice. She learned that Charles had changed the password and he denied her access to the account. Instead, for the October and November payments, she mailed the payments directly to the mortgage company through her checking account. But after she mailed the November 2021 payment, Charles soon evicted her from the Property.

Contrary to Linda's testimony, Charles testified he owned the Property as of the date it was purchased. Charles conceded that Linda paid the down payment but contested that she made any mortgage payments. Instead, he contended she merely paid "rental payments" to the mortgage company. He testified they did not sign a rental agreement because it "was understood" between

4

them. Charles testified that, after he evicted Linda and took possession of the property, he invested about $30,000 to fill in the swimming pool and demolish a pool room.

At the conclusion of trial, the jury was asked three questions. First, it was asked whether the Property should be transferred to Linda through the imposition of a constructive trust due to wrongful retention and unjust enrichment. The jury answered, "Yes." Second, the jury was asked whether Charles intentionally inflicted severe emotional distress on Linda. Again, it answered, "Yes." Third, the jury was asked what sum of money, if paid in cash, would fairly and reasonably compensate Linda for actual damages, if any, resulting from the conduct in question two. The jury answered, $200,000. The presiding juror certified the verdict was unanimous and all 12 jurors agreed to each and every answer. The trial court entered a final judgment in accordance with the jury's verdict. Charles thereafter filed a motion for new trial, which the trial court denied.

This appeal followed.

## II. Issues on Appeal

Charles presents six issues on appeal, which generally cover four topics. First, he asserts the claim for IIED is barred because Linda had another viable cause of action to recover her damages. Second, he challenges the legal and factual sufficiency of the evidence to support the jury's finding on the IIED claim. Third, he asserts the imposition of a constructive trust was impermissible in this case. Fourth, he challenges the damages award as being excessive and claims it exceeded the amount pleaded.

We begin with Charles's multi-issue challenge against the legal and factual sufficiency of the evidence supporting the IIED claim.

5

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In three issues that we consider together, Charles challenges the sufficiency of the evidence in support of the jury's finding on IIED.[4] Specifically, Charles contends the evidence was insufficient to support a finding that his conduct was outrageous.

### A. Standard of review

When, as here, a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We will sustain a legal sufficiency challenge if there is no proof of a vital fact, rules of law or evidence bar the court from giving any weight to the only proof of a vital fact, the proof supporting a vital fact is no more than a scintilla of evidence, or the proof conclusively shows the opposite of a vital fact to be true. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). In conducting our review, we credit evidence supporting the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *See City of Keller*, 168 S.W.3d at 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.*

If a party attacks the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the finding is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

---

[4] In Charles's first issue, he contends Linda's IIED claim was not recoverable because there was another remedy available through a claim of unconscionable conduct through Tex. Bus. & Com. Code Ann. § 17.49(c)(3). We need not reach this issue as the legal sufficiency of the evidence is dispositive of the IIED claim.

### B. Elements of IIED

The tort of IIED has four elements: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017); *Moore v. City of Wylie*, 319 S.W.3d 778, 783 (Tex. App.—El Paso 2010, no pet.). To meet the second element, a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). Typically, recovery for IIED must be based on circumstances that border on "serious criminal acts." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 818 (Tex. 2005). Generally, insensitive or rude behavior does not constitute extreme or outrageous conduct. *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611–12 (Tex. 1999). "Likewise, liability does not arise from mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Bill Wyly Dev., Inc. v. Smith*, 680 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2023, no pet.).

In the first instance, it is for the court to decide whether a defendant's conduct was extreme and outrageous. *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). "But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability." *Id.* The severity and duration of the challenged conduct are central considerations. *Bruce*,

998 S.W.2d at 617. Additionally, we examine the context and relationship between the parties when considering whether certain conduct qualifies as extreme and outrageous. *Id.* at 612.

## C. Analysis

Although Charles agrees his conduct was intentional, and he may have caused Linda emotional distress "as shown by her episodic crying and worry about where she would go [after he evicted her]," he nonetheless contends he simply exercised his legal rights as a property owner. In short, he contends he did not act at a level of extreme and outrageous conduct as required to support a claim for IIED. We agree.

The jury heard evidence that Linda had sought and relied on Charles's help—as an attorney, as a licensed real estate agent, and as her uncle—to assist with her purchase of the Property. There was also evidence that Linda believed she owned the Property and she made mortgage payments for over 14 years. Charles demanded payments from Linda when she attempted to refinance the mortgage loan, and his demands increased in size from $10,000 to $80,000 as years passed by. Charles then evicted Linda and her family in 2022, after they had lived in the house since 2007. Additionally, there was evidence that Linda experienced distress from her fear of losing her home.

On the record presented, Charles's conduct was not extreme enough to establish the element of outrageousness. The facts of this case are dissimilar to facts where courts found the evidence sufficient to support the outrageous element required of an IIED claim. *See Morgan v. Anthony*, 27 S.W.3d 928, 930–31 (Tex. 2000) (holding there was sufficient evidence of extreme and outrageous conduct where a man—who stopped to assist a female motorist having car trouble on a rural highway—repeatedly harassed her with sexual advances, followed her, and blocked her escape); *Bruce*, 998 S.W.2d at 613–14 (holding there was sufficient evidence of extreme and

8

outrageous conduct when, over a period of more than two years, a supervisor used harsh language and sexual innuendo; physically threatened employees; charged and screamed at them; and stared at them for as long as 30 minutes at a time).

On the other hand, instances of harassing behavior with obscene or threatening language over months or years has also been held to be insufficient to support an IIED claim. *See Tiller v. McLure*, 121 S.W.3d 709 (Tex. 2003) (holding, during the completion of a construction project, conduct of repeated calls during non-business hours, threats of cancelling the contract, and being consistently rude and demanding was insufficient to amount to extreme and outrageous); *Union Pacific Railroad Co. v. Loa*, 153 S.W.3d 162, 164 (Tex. App.—El Paso 2004, no pet.) (holding vulgar, obscene, and racist insults, were not sufficiently extreme and outrageous to support recovery for IIED); *Saucedo v. Rheem Manufacturing Co.*, 974 S.W.2d 117, 123–24 (Tex. App.—San Antonio 1998, pet. denied) (providing that conduct of co-worker repeatedly humiliating plaintiff with obscene language, insulting plaintiff, threatening to have plaintiff fired, and frequently calling or paging plaintiff unnecessarily late at night was insufficient to amount to extreme and outrageous). Without citing to any case or to other authority, Linda contends Charles's actions demonstrated an abuse of trust and power, and she met the required threshold of extreme and outrageous conduct. We disagree.

Here, as Charles put it, his conduct was certainly "thoughtless and crass." But without more, it was not enough to amount to extreme and outrageous. Although Charles's actions can be characterized as an abuse of trust and power, they were not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman*, 855 S.W.2d at 621. Accordingly, we

hold there is legally insufficient evidence to support the jury's finding that Charles inflicted severe emotional distress on Linda.

We sustain Charles's second, third, and fourth issues. Because we reverse the judgment on the IIED claim, we need not address Charles's sixth issue where he contends the damages awarded were excessive.

## IV. CONSTRUCTIVE TRUST

In his fifth issue, Charles contends that because Linda failed to establish her claim for IIED, there is no other basis for a constructive trust. We disagree.

"A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). Because a constructive trust is a remedy—not a cause of action—"an underlying cause of action such as a breach of fiduciary duty, conversion, or unjust enrichment is required." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App.—Texarkana 2013, pet. denied). "The constructive trust is merely the remedy used to grant relief on the underlying cause of action." *Id.* Three elements are generally required for a constructive trust to be imposed under Texas law: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property. *KCM Fin.*, 457 S.W.3d at 87.

This remedy is premised on the "equitable notion that the acquisition or retention of the property is wrongful" and the possessor of the property would be unjustly enriched if they were allowed to retain the property. *KCM Fin.*, 457 S.W.3d at 88 (quotations omitted). The party requesting a constructive trust must establish, among other elements, the breach of a special trust or fiduciary relationship or actual or constructive fraud. *Id.* at 87; *see also May v. Little*, 473 S.W.2d 632, 635 (Tex. App.—El Paso 1971, writ ref'd n.r.e.) (constructive trust is a remedial

10

concept and fraud of some type, including breach of fiduciary duty, must be present for it to be imposed).

Linda sought a constructive trust on the house based on her claim that Charles had wrongfully acquired and retained the Property. She alleged his involvement in the purchase of the house was "part and parcel" of his attorney-client relationship with her. Following a contested trial, the jury was asked whether legal title to the Property should be transferred to Linda through the imposition of a constructive trust, to which the jury answered "Yes." In the trial court's judgment, it ordered that legal title to the Property be transferred to Linda through the imposition of a constructive trust.

On appeal, Charles does not challenge the sufficiency of the evidence in support of the jury's finding. Instead, he concedes that Linda "pled and clearly proved a breach of fiduciary duty." Because Charles conceded that Linda had established a "breach of a special trust or fiduciary relationship," and because he does not challenge the other elements she was required to establish, we conclude the record supports Linda's entitlement to the imposition of a constructive trust on the Property.

We overrule Charles's fifth issue.

## V.   CONCLUSION

We reverse and render a take-nothing judgment on Linda's intentional infliction of emotional distress claim and modify the judgement to delete the $200,000 awarded to her as actual damages. We affirm the remainder of the final judgment, which awarded and ordered that legal title to the Property be transferred from Charles to Linda through the imposition of a constructive trust.

11

GINA M. PALAFOX, Justice

September 8, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.